(No. 87519.—

*In re* C.N., a Minor (The People of the State of Illinois, Appellant, v. Diane N. *et al.*, Appellees).

*Opinion filed May 24, 2001.*

James E. Ryan, Attorney General, of Springfield, and David R. Akemann, State's Attorney, of St. Charles (William L. Browers and Mary Beth Burns, Assistant Attorneys General, of Chicago, and Norbert J. Goetten, Martin P. Moltz and David A. Bernhard, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

Josette Skelnik, of Elgin, for appellee Mark N.

Phyllis J. Perko, of the Law Offices of Harlovic and Perko, of West Dundee, for appellee Diane N.

JUSTICE FITZGERALD delivered the opinion of the court:

Following an evidentiary hearing in the circuit court of Kane County, the circuit court found that respondents, Diane N. and Mark N., were unfit parents under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1996)), because they failed to make "reasonable progress" toward the return of their daughter, C.N., within 12 months of her adjudication as a neglected minor. The circuit court subsequently terminated respondents' parental rights to C.N., and respondents appealed. The appellate court reversed, holding that the circuit court's finding of unfitness was against the manifest weight of the evidence. Nos. 2—98—0565, 2—98—0674 cons. (unpublished order under Supreme Court Rule 23). We reverse the judgment of the appellate court, and affirm the judgment of the circuit court terminating respondents' parental rights to C.N.

## BACKGROUND

On October 17, 1994, the Department of Children

and Family Services (DCFS) took protective custody of S.S. (born August 2, 1990) and her half-sister, C.N. (born May 15, 1994).[1] Two days later, the State filed a petition for adjudication of wardship as to both minors, naming Diane N. as the minors' mother, and Diane's reported husband, Marin N., as C.N.'s father. The State alleged that Diane and Marin physically abused S.S., or allowed such abuse to occur, and that C.N. was at risk. According to the State's petition, S.S. was hospitalized with two skull fractures, a laceration to the forehead, and bruises to the head, chest, and buttocks. The State further alleged that C.N. and S.S. were neglected in that their environment was injurious to their welfare.

On January 3, 1995, Diane admitted that the minors' environment was injurious to their welfare. As to Diane only, the court adjudged S.S. and C.N. neglected. The court found that it was in the minors' best interests that they be made wards of the court, and appointed DCFS guardian. S.S. and C.N. were placed in foster care, but S.S. was later placed in a residential treatment center. The court ordered Diane to cooperate with DCFS and its contracting agencies; comply with all aspects of the client service plan; submit to a substance abuse evaluation and follow all recommendations; undergo a psychological evaluation and follow all treatment recommendations; and complete parenting classes.

On January 31, 1995, the State filed a "petition II" for adjudication. The State alleged that Marin committed aggravated criminal sexual assault against S.S.; that C.N. showed signs of sexual abuse; and that Diane failed to protect S.S. and C.N. from sexual abuse.

During the course of the circuit court proceedings, the parties learned that Diane was not divorced from her first husband at the time she married Marin. Accord-

---

[1]This appeal concerns the termination of parental rights only as to C.N.

ingly, Diane's first husband, whom she married in 1990, would have been the presumptive father of C.N. Amid claims by respondents, however, that Mark, Marin's brother, is C.N.'s father, on August 8, 1995, the circuit court ordered paternity testing. The November 1995 test results confirmed that Mark is C.N.'s father. On May 6, 1996, the State filed an amended petition for adjudication, and an amended petition II for adjudication, naming Marin as C.N.'s uncle and Mark as C.N.'s father. Shortly thereafter, Mark filed a petition seeking a determination of paternity as to C.N. The court ruled on that petition on May 21, 1996, finding Mark to be C.N.'s father.

On June 5, 1996, Diane and Mark stipulated that S.S. and C.N. were sexually abused by Marin, that S.S. was physically abused by Marin, and that Diane caused or allowed such physical abuse. Accordingly, the circuit court adjudged C.N. a neglected and abused minor as to both respondents. For a second time, the circuit court found that it was in the best interest of the minors that they be made wards of the court, and again placed guardianship in DCFS.

The circuit court ordered Diane to cooperate with DCFS, its agents, and the client service plan; begin counseling at Sinnissippi Centers and follow all treatment recommendations; continue to participate in in-home parent education classes until she consistently exhibited appropriate parenting and nurturing behavior; and cooperate with the psychological evaluation and sexual offenders assessment. The circuit court ordered Mark to continue participating in in-home parenting classes until he consistently exhibited appropriate parenting and nurturing behavior; participate in a psychological evaluation; participate in a drug and alcohol assessment; participate in a comprehensive social assessment; and cooperate with DCFS, its agents, and

the client service plan. Although the circuit court also ordered Mark to participate in counseling for sexual offenders, that portion of the order was stricken and Mark was, instead, ordered to participate in counseling for the family of sexual offenders.

Sixteen months later, on October 7, 1997, the State filed a petition to terminate respondents' parental rights to C.N. The State alleged, in relevant part, that respondents were unfit under section 1(D)(m) of the Adoption Act because they failed "to make reasonable progress towards the return of the child within 12 months after an adjudication of neglected minor, abused minor or dependent minor." An evidentiary hearing on the State's petition commenced on February 3, 1998. The State called several witnesses.

### Peggy Everling

DCFS investigator Peggy Everling testified that she responded to a hot line call on July 11, 1994, informing her that S.S. and C.N. were at risk, and that S.S. had been injured by Marin, the putative father. At the time of the hot line call, Diane, Marin, and the two minors were living together at the Maple Park Motel. S.S. told Everling that she had been lying in bed with Marin, became sick, and vomited in the bed. Marin became upset and "whacked" her on the head. When Diane returned home, S.S. told her what had happened, and Diane confronted Marin. Marin grabbed a steel pipe and, in the course of trying to hit Diane, hit S.S. in the mouth, chipping her tooth. Diane disputed S.S.'s account of how the injuries occurred, but told Everling that she was aware that Marin had a temper and that he had previously hit S.S.

Mark told Everling that he, too, had seen Marin hit S.S. on prior occasions. Mark also witnessed the July 1994 incident, and in response had called the police. Mark signed the complaint against Marin in connection with that incident because Diane refused to do so. Al-

though Mark appeared concerned about the children and was cooperative, Everling was concerned that Mark had failed to intervene when Marin became abusive. Diane was minimally cooperative and appeared more concerned about Marin than the children. Diane did not want to keep Marin away from S.S. and C.N. during the DCFS investigation, and posted Marin's bail following his arrest.

### Lynn Appelt

DCFS investigator Lynn Appelt responded to another hot line call in October 1994, informing DCFS of certain injuries to S.S. Appelt testified that in a telephone conversation on October 17, 1994, Diane advised Appelt that Marin was no longer living with her, that Marin was staying with a friend whose name and address she could not remember, and that she wanted nothing to do with him. Diane told Appelt that C.N. was with a baby-sitter, and that she wanted to give guardianship of C.N. to her brother.

Investigation by DCFS revealed that C.N. was with Marin at the baby-sitter's home. Appelt determined that the baby-sitter was not an appropriate caregiver in light of the baby-sitter's prior contact with DCFS due to an injurious home environment. Appelt eventually located Diane, Marin, and C.N. at the Oregon, Illinois, home of Diane's father, where Appelt took C.N. into protective custody. Appelt later learned that the brother with whom Diane wished to place C.N. had sexually abused Diane, making placement with him inappropriate.

Appelt also testified that she spoke to S.S. at her foster home in early November 1994, and observed an injury to the child's forehead, with 20 to 25 stitches. S.S. told Appelt that she had been hit on her feet with a stick, that she had been hit with a "Mr. Big Stick," and that her mother had slapped her in the face. S.S. also stated that Marin would leave her and C.N. at home alone, and

that she had told her mother this was happening. Diane denied slapping S.S., and told Appelt that Marin did not abuse S.S. Diane admitted that S.S. had been hit and sexually abused, but implicated a former husband and other men with whom Diane had been involved.

Appelt testified that she took C.N. into protective custody because of the current injuries to S.S., the past history of abuse, Diane's lack of cooperation with DCFS, Diane's lack of judgment in suggesting placement for the minors with her brother, Diane's inability to protect her children, and Diane's inability to appreciate the dangerous situations in which she placed her children. Mark had not been implicated in the abuse and was not a subject of Appelt's investigation at that time.

### Rich Maier

Rich Maier, a DCFS child welfare specialist, testified that DCFS received another hot line call during November 1994, indicating that S.S. and C.N. had been sexually abused.

Maier drafted the initial client service plan that month, which was directed to Diane and Marin. Under the plan, Diane was to obtain a substance abuse evaluation and a psychological evaluation, participate in counseling and parenting classes, and obtain and maintain appropriate housing. The permanency goal of the initial service plan was "return home." In early February 1995, Maier rated Diane's progress toward this goal satisfactory. Maier testified that Diane had started counseling with Amy Unterborn at St. Charles Family Center; she had obtained a substance abuse evaluation; and she was either attending or about to begin parenting classes at the Four C's (Community Coordinated Child Care). Although the substance abuse evaluation revealed no alcohol or substance abuse by Diane, based on Diane's family history and Diane's own drinking pattern, the evaluator recommended alcohol education.

Maier also drafted the February 1995 service plan. By this time, Mark and Diane had advised Maier that Mark may be C.N.'s father. The February 1995 service plan, however, was directed only to Diane and Marin because Mark's paternity was not yet established. Under the plan, Diane was required to participate in counseling to examine her role in the removal of her children and to receive the recommended alcohol education. She was also required to participate in parenting classes and set up a stable housing situation. On his own accord, Mark accompanied Diane to all six parenting classes at the Four C's, successfully completing the program.

### Tim Rezash

Tim Rezash, an intern at the Ben Gordon Community Mental Health Center, completed a psychological assessment of Diane in early 1995. Rezash testified that, normally, parents in Diane's situation blame themselves for the abuse of their children and ask themselves what they could have done differently. Diane did not exhibit this behavior. She did not feel responsible in any way for the abuse of her daughters and did not empathize with them. Rezash did not consider Diane a good candidate for insight-oriented therapy and, instead, recommended behavior and cognitive therapies. His prognosis for success was poor to guarded.

### Amelia Apperson

Amelia Apperson, a DCFS child welfare specialist, was the primary case worker between March 1995 and September 1996. At the time she assumed responsibility for the case, Mark and Diane resided together.

In August 1995, Apperson evaluated Diane's progress with respect to the February 1995 service plan goal of "return home." Apperson rated Diane's progress unsatisfactory. Apperson testified that Diane was uncooperative and failed to complete tasks and objectives set forth

in the client service plan. Diane failed to attend counseling on a regular basis, continued to deny any responsibility for the abuse of her children, and, notwithstanding her completion of a parenting class, failed to exhibit appropriate parenting skills during visits with C.N. Based on Apperson's own observations, and a recommendation from Amy Unterborn, Diane's counselor, Apperson suggested in-home parenting classes involving both Diane and Mark. Apperson explained to them the specific behaviors with which she was concerned. Although at this point paternity testing had not yet been completed, Mark told Apperson that he knew he was C.N.'s father. The August 1995 service plan was therefore directed to Diane, Marin, and Mark. In drafting the August 1995 service plan, Apperson took into account an assessment of C.N. which indicated that she was developmentally delayed by six months due to a prior lack of stimulation and nurturing. The plan specified that, during supervised visits, Diane spend more time interacting with C.N., rather than with the visit supervisor.

Apperson further testified regarding a September 8, 1995, visit by respondents with C.N. at the DCFS office. Apperson's supervisor terminated the visit after respondents became visibly angry in response to a parenting suggestion made by the visit supervisor. Diane raised her voice and hit a wall outside the visiting room. Mark commented that it was "bullshit" and a "Gestapo regime." Apperson testified that this visit was the first in a long line of visits which appeared to cause C.N. great stress. C.N. would cry, bite herself, pull her hair out, and bang her head.

During the period November 1995 to January 1996, Apperson felt that respondents had failed to make progress toward the goal of "return home." Although Diane consistently attended counseling sessions, the couple's progress in the in-home parenting classes was inconsistent. In addition, visits with C.N. were still going poorly.

In late February 1996, Apperson rated respondents' progress unsatisfactory. Apperson cited Diane's lack of cooperation with DCFS service providers, her failure to be present for all in-home appointments, her inconsistent attendance at counseling, her failure to address the past abuse, her failure to keep rent and utilities current, and her poor judgment in allowing various individuals to live with her and Mark. Apperson's written evaluation reflected many of the same concerns about Mark. Apperson also testified that respondents failed to complete in-home parenting classes. In the February 1996 service plan, Apperson changed the permanency goal from "return home" to "foster parent placement," but testified that the goal could be changed at any time, based on the cooperation and progress of the parents.

In March 1996, Apperson had discussions with Mark concerning his plan to obtain custody of C.N. Apperson was concerned about Mark's understanding of C.N.'s emotional health. Other than regaining custody, Mark had no plan to deal with C.N.'s emotional needs.

Apperson further testified that sometime during the period of March 1996 through May 1996, Amy Unterborn discharged Diane from counseling. Diane's attendance was poor and her efforts in therapy were sporadic. Believing that the commute to Unterborn's office may have been a problem for Diane, Apperson referred Diane to the Sinnissippi Centers, an agency closer to Diane's home. Diane did not complete the initial assessment at Sinnissippi, explaining to Apperson that she would not discuss her personal life with a counselor.

Apperson was also concerned about the stability in respondents' present home because they continued to allow other persons to live with them. Diane reported that one of the women who lived with them had stolen from her, and that a cousin had taken one of respondents' vehicles to Arkansas without their permission. Mark also

reported an incident in which he discovered one of the persons who was living with them going through their belongings.

Following the circuit court's determination that Mark is C.N.'s father, Apperson did not explore the possibility of returning C.N. to Mark because he continued to live with Diane. Apperson was also concerned about Mark's judgment and ability to care for C.N. Mark admitted that he had been involved in C.N.'s life before she had been placed in foster care. C.N., however, was developmentally delayed due to a lack of stimulation and nurturing. In addition, Mark continued to minimize the impact of the abuse on C.N. Mark felt that if he simply brought C.N. home and loved her, she would get better. Apperson explained that C.N. had special needs, requiring "serious therapy, serious structure, serious care."

In August 1996, Apperson evaluated respondents' progress under the February 1996 service plan. Apperson rated Diane's cooperation and completion of tasks unsatisfactory, citing Diane's unsuccessful discharge from counseling with Amy Unterborn, her failure to complete the assessment at Sinnissippi Centers, and her failure to advise Apperson at one point that she was homeless. Apperson rated Mark's cooperation unsatisfactory, noting the adversarial role he took with her and his failure to sign certain releases, thus preventing referrals for counseling. Apperson also rated respondents' progress in demonstrating adequate parenting skills unsatisfactory. Apperson relied on her own observations, as well as reports from the visit supervisor and the in-home educator. Apperson testified that during the August 1996 administrative case review, as she discussed the reduced visitation schedule with respondents, they became belligerent and the reviewer asked them to leave.

### Amy Unterborn

Amy Unterborn, a licensed social worker at Therapeu-

tic Solutions, Inc., an affiliate of St. Charles Family Center, began counseling Diane individually in November 1994. Unterborn testified that the focus of the counseling was on parenting skills relative to establishing a safe environment, anger management, problem solving, and appropriate child development expectations.

From November 1994 to June 1995, Diane missed two appointments. During this time, Diane had difficulty processing issues involving the creation of a safe environment in the home and how her actions might impact safety and stability in the home. Diane also did not recognize that her children would suffer long-term consequences due to the abuse.

From June 1995 through July 1995, Diane missed one appointment. During this period, therapy continued to focus on the establishment of a safe environment for Diane's children, problem-solving skills, and appropriate child development expectations.

From July 1995 through October 1995, Unterborn had sessions with Diane and C.N. Unterborn testified that Diane expected C.N. to use logic and reason that a child of C.N.'s age would not possess. Diane expressed her lack of understanding of C.N.'s special needs, and admitted that she had exposed S.S. and C.N. to an inadequate environment. According to Unterborn, this understanding is the first step in taking responsibility and establishing new behaviors. During this period, Diane had difficulty expressing anger in appropriate ways, she did not internalize the concepts that were worked on in therapy, and she did not demonstrate the skills necessary for a safe environment. Unterborn was also concerned about the miscommunication Diane created, which frustrated the efforts of professionals to coordinate care for Diane and her children. Unterborn testified that Diane's prognosis was guarded.

From October 1995 through January 1996, Diane

missed four appointments, one of which was an excused absence. During this period, Diane's life was chaotic with respect to employment and housing, and she made no progress toward stability. She was not responding constructively to daily stressors. Diane also made little progress in her ability to empathize with C.N. in that she failed to recognize the impact of the emotional distress stemming from the abuse. Diane did not demonstrate a mature relationship with Mark focused on child rearing. Diane disclosed that she had frequent transient house guests with whom she had verbal and physical altercations. In therapy, Diane focused on her anger at DCFS, rather than focusing on the skills she needed to develop. Diane's progress was minimal and the prognosis was guarded.

Between January 1996 and April 1996, Diane had one unexcused absence and three excused absences. Diane told Unterborn that she was confident that once her children were returned to her that they would then be able to get the care they needed. Unterborn testified, however, that Diane's home was not stable enough to handle the emotional disturbances that C.N. was exhibiting. Diane was not able, in therapy, to articulate possible ways of dealing with C.N.'s self-mutilating behavior or instances where C.N. acted out sexually. Diane did not indicate that she could set limits for C.N. or handle a crisis. Diane also continued to have relationships with individuals who were adversarial and often unstable.

In May 1996, Unterborn discharged Diane from therapy because of her failure to keep the attendance contract. Unterborn did not feel that Diane was making a reasonable effort to get to counseling. Unterborn testified that Diane had not made reasonable progress, given the length of therapy, and, at discharge, Diane's prognosis remained guarded. According to Unterborn, Diane could have made more progress had she spent more time focus-

ing on counseling rather than how to manipulate the system.

### Patty Klapperich

Patty Klapperich, a homemaker for DCFS, supervised visits between respondents and C.N. during the latter part of 1995. Klapperich testified that Mark generally engaged in the child care to a greater degree than Diane, who would tell Mark what to do.

During a visit on September 8, 1995, Klapperich, who was instructed to do parent education during the visits, made several parenting suggestions regarding the feeding of C.N. Klapperich testified that Mark became increasingly aggravated and furious. Both Mark and Diane were yelling. A supervisor terminated the visit. According to Klapperich, C.N. had a difficult time with subsequent visits, most of which ended early because Diane did not have the endurance to work with C.N.

### Andy Thompson

Andy Thompson, a child care advocate at Sinnissippi Centers in Rochelle, Illinois, testified that DCFS referred respondents for participation in the parenting program. Beginning in late August 1995, and continuing for a period of about nine months, Thompson worked with respondents once or twice a week in their home. Thompson first spoke to respondents by telephone on August 30, 1995. When Thompson identified herself, Mark became angry and told Thompson that DCFS was harassing him. Respondents' dissatisfaction with DCFS came up at almost every session.

Thompson testified that, overall, respondents were not cooperative and their attendance at the parenting sessions was sporadic. On five or six occasions, respondents were not home. On approximately four occasions, respondents were home, but said they had forgotten about the session. On other occasions, Diane did not ar-

rive home until after the session had already started. On yet another occasion, Diane said her time was limited because she had an appointment elsewhere. Finally, on one occasion Diane did not participate because she was asleep on the couch and Mark's efforts to wake her were unsuccessful. Thompson also testified that one session was delayed by 20 minutes while respondents searched for jewelry supposedly stolen by a house guest.

According to Thompson, respondents made little progress in the parenting classes. Although respondents scored high on a pretest and understood the book material, they did not put into practice the concepts they learned. Respondents continued to display negative behaviors discussed in prior sessions. Sinnissippi terminated services when respondents moved out of the area.

### James Jorgenson

James Jorgenson, owner of Taking Control, a psychological counseling facility, testified that in 1995 DCFS referred Diane to him to evaluate the degree of bonding between her and C.N. During the assessment, Jorgenson observed very little interaction between Diane and C.N. Diane tried to coax a positive reaction from C.N., but C.N. became increasingly upset. Jorgenson decided to terminate C.N.'s involvement and continued the assessment with Diane alone; Diane appeared relieved.

Jorgenson testified that Diane displayed little emotion in regard to her children; she focused on what had been done to her, rather than what had been done to them. Diane expressed only a perfunctory concern for the safety of her children and spoke about them as possessions. Jorgenson believed that unresolved issues from Diane's past, including her own abandonment and abuse as a child, and her combative way of dealing with the world, reduced her effectiveness as a parent. He testified that Diane is unable to set limits and boundaries for her children, which impacts her ability to protect them. Jor-

genson concluded that Diane was not able to deal with C.N.'s needs at that time, and would not be able to do so in the near future. Jorgenson recommended that C.N. not be returned to Diane until further rehabilitative measures were taken, but that if Diane was not cooperative, DCFS should consider pursuing the termination of Diane's parental rights. According to Jorgenson, Diane displayed combativeness and vindictiveness toward DCFS.

### Patricia Kozlowski

Patricia Kozlowski, a homemaker with Colton Health Care, worked with respondents from November 1995 to May 1997. As a homemaker she supervised weekly visits with C.N. and transported C.N. to visits. Typically, visits took place at a Target store or at the park. Although Kozlowski was not to give parenting instructions, she was required to stop anything that was inappropriate. Kozlowski testified regarding several visits in which respondents engaged, or attempted to engage, in conduct she considered inappropriate. Such conduct by Diane included giving C.N. a plastic serrated knife to play with, instead of a plastic spoon, and failing to wash her hands after changing C.N.'s diaper. Conduct by Mark that Kozlowski considered inappropriate included offering C.N. a dirty pacifier and discussing a horror movie in graphic detail in front of C.N., who was two years old at the time. Kozlowski also testified that both respondents repeatedly smoked while holding C.N.; placed food directly on the table or highchair, instead of using a plate; gave C.N. too much food at one time, in pieces that were too large; and failed to check C.N. for other marks after noticing red dots on her neck. Kozlowski also testified that Diane had ended a visit early because C.N. was "boring" in that she was withdrawn and would not walk or talk.

### Jennifer Saleuckyj

DCFS caseworker Jennifer Saleuckyj testified that, in

February 1997, she evaluated the August 1996 client service plan that Amy Apperson drafted. Saleuckyj rated the progress of respondents unsatisfactory. Respondents did not feel they should have been "indicated"[2] and did not see the need for services. Respondents did not participate in any parenting classes from August 1996 to the time of Saleuckyj's evaluation. Although Diane completed a psychological evaluation, it took her five months to do so. Mark was not participating in any counseling, with the exception of an "on-call" service of which DCFS had no information, and did not complete alcohol and psychological assessments until the latter part of January 1997.

Notwithstanding the unsatisfactory rating in February 1997, Saleuckyj felt that respondents could still work toward regaining custody of C.N. Saleuckyj created a new service plan with the same tasks as the August 1996 plan. Based on the issues that brought the family to the attention of DCFS, the main component of the service plan was counseling. Respondents agreed to follow through on a referral to Family Advocate to address issues of child protection and how to care for children who have been sexually abused. Respondents also agreed to participate in in-home parenting services.

### John Larson

DCFS caseworker John Larson was assigned the case in March 1997. In August 1997, he evaluated the service plan of February 1997. One objective under the plan was that Diane participate in a counseling assessment at Family Advocate. Larson rated Diane unsatisfactory on this objective, and other objectives regarding counseling, because Diane had made no attempt to attend the counseling services. Similarly, Larson rated Mark unsat-

---

[2]Under the Abused and Neglected Child Reporting Act, if an investigation determines that credible evidence of the alleged abuse or neglect exists, an "indicated report" is made. 325 ILCS 5/3 (West 1998).

isfactory on the objectives of the service plan dealing with counseling. The only counseling in which Mark was involved was a telephone counseling service.

Under the service plan, Mark was also required to have adequate housing for all family members. Larson rated Mark unsatisfactory on this objective because respondents' residence had been found unfit for habitation by the City of Rockford. Larson testified, however, that Mark subsequently obtained acceptable housing with the help of DCFS. Larson also testified that Mark successfully completed a psychological assessment and a drug and alcohol assessment, and that further services in this area were not indicated.

Larson rated respondents unsatisfactory with respect to parent training, in that they failed to follow through on Larson's referral to Catholic Charities. Larson was not aware that respondents had completed an academic parenting class. Larson also testified that respondents later attended parenting classes at a different service provider, but that the classes were not comparable in depth or length to the classes at Catholic Charities.

### Amy Butt

Amy Butt, an employee of Family Advocate, testified that her agency specializes in the treatment of sexual abuse and offers counseling to address issues relating to the parenting of a child who was abused. Through DCFS, respondents were referred to Family Advocate for an assessment, which requires five sessions. Respondents did not attend any of the five initial sessions scheduled for them in March and April 1997. Another appointment was scheduled in May 1997. Ultimately, the agency closed the file without services being provided to respondents.

### Elaine Gaither

Elaine Gaither, the parenting coordinator at Catholic Charities of Rockford, testified that she received a refer-

ral from DCFS to involve respondents in parenting classes. Respondents attended an orientation class in July 1997, but failed to attend their first scheduled class in early August, apparently due to transportation and child care problems. Gaither tried to work with respondents on child care issues, and tried to accommodate their schedules, switching their class time. She also gave Diane referrals to alternate parenting programs in the community. During one telephone call in which Diane indicated that she had failed to follow up on Gaither's recommendation for child care, Diane became angry and argumentative. Ultimately, respondents were discharged from the program for lack of attendance.

The State rested. Respondents each moved for a "directed finding," which the trial court denied. Respondents did not testify. They, however, called three witnesses.

### Elaine Goodwin

Elaine Goodwin, a parent educator at the Four C's, testified that, beginning on January 17, 1995, respondents attended a group of six parenting classes. The key topics included child development, parent-child communication, parent and child self-esteem, stress management, child guidance, behavior management, and appropriate disciplinary techniques. Respondents satisfactorily completed homework assignments and participated in class discussions. Mark scored 83% on a pretest and 89% on a post-test. Diane scored 87% on a pretest and 91% on a post-test. Goodwin did not observe respondents with their children.

### Julie Thompson

Julie Thompson, a licensed clinical social worker with Family Consultation Services, testified that she met respondents in September 1997, in conjunction with their attendance at a small group parenting class that she

taught. The focus of the class, which consisted of three sessions, was behavior management. Although respondents expressed their anger at the system, their attitude toward the class was positive. Thompson testified that respondents' participation in class discussion indicated a knowledge of child development and parenting skills greater than the average participant, which suggested that they had attended parenting classes prior to her class. Although Thompson never observed respondents with their children, based on their class participation, it appeared to her that respondents were applying their knowledge of parenting skills. Thompson testified that a child who has special needs requires "more intense parenting," and that a parent may have trouble parenting a child with special needs, but no trouble parenting a child without special needs.

Marcia Shaw

Marcia Shaw, a licensed clinical social worker with Family Consultation Service, testified that she met respondents in November 1997. Diane attended 14 or 15 counseling sessions with Shaw; Mark attended an unspecified number of sessions. According to Shaw, Diane has "book knowledge" of parenting, but does not apply it. Mark, however, applied the parenting skills he learned, and due to Diane's job, did the bulk of the parenting.

Shaw testified that, in terms of dealing with the sexual abuse of S.S. and C.N., Diane made progress in that she verbalized her responsibility for the abuse, acknowledging that she failed to protect her child. Mark also made progress in that his initial anger over the removal of C.N. was replaced with sadness and compassion, which Shaw believed was "more real." The counseling sessions did not address how to parent a child who was a victim of sexual or physical abuse.

Shaw testified that, as a result of the removal of S.S. and C.N., Diane was depressed, and that such depression

interfered with Diane's ability to be responsible. According to Shaw, Diane is less depressed with medication and more able to accept responsibility. Diane is working less hours and is able to be at home more of the time. Mark, who is a cook by profession, has assumed the role of a "house husband." Respondents' anger with DCFS has lessened.

Respondents rested.

Following argument, on April 28, 1998, the circuit court ruled that the State had proved, by clear and convincing evidence, that respondents were unfit in that they failed to make reasonable progress toward the return of C.N. within 12 months of the neglect adjudication. As set forth in its written order, the circuit court found, *inter alia*, that respondents failed to accept responsibility for the abuse sustained by C.N. and her sibling; respondents focused energy on hostility toward DCFS and its agents and not on attaining reunification with C.N.; respondents repeatedly failed to comply with the court's directives regarding services which needed to be completed in order to accomplish reunification; and respondents repeatedly refused to attend services, or attended sporadically, resulting in termination of the services. The court also found that evidence of respondents' ability to parent two later-born children was irrelevant.[3]

The matter was continued for a hearing to determine whether termination of respondents' parental rights was in the best interests of C.N. Following that hearing, on May 8, 1998, the court entered an order terminating respondents' parental rights to C.N. Respondents appealed, and the appellate court reversed. Nos. 2—98—0565, 2—98—0674 cons. (unpublished order under

---

[3]During the course of the circuit court proceedings, Diane and Mark became parents of two more daughters, M.N. and L.N. Any issues involving M.N. and L.N. are not before this court.

Supreme Court Rule 23). We granted the State's petition for leave to appeal. See 177 Ill. 2d R. 315.

## ANALYSIS

### I. Indian Child Welfare Act

We consider first the argument of respondent-father, Mark, that the appellate court erred by failing to remand this cause to the circuit court for a determination on the record as to the applicability of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 *et seq.* (1994)). Whether the circuit court was required, under the facts and circumstances of this case, to make such a determination is a legal issue which we review *de novo*. See *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998) (where appeal presents issue of law review is *de novo*).

The ICWA was enacted by Congress in 1978 in response to the growing concern over the consequences to Indian children, families and tribes of abusive welfare practices which separated large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 104 L. Ed. 2d 29, 36, 109 S. Ct. 1597, 1599-1600 (1989). The ICWA sets forth minimum federal standards for the removal of an Indian child from his or her family. 25 U.S.C. § 1902 (1994). At the heart of the ICWA are its provisions relating to jurisdiction over Indian child custody proceedings. *Holyfield*, 490 U.S. at 36, 104 L. Ed. 2d at 38, 109 S. Ct. at 1601. Under section 1911(a) of the ICWA, the tribal courts have exclusive jurisdiction over any child custody proceeding involving an Indian child who resides or is domiciled within the tribe's reservation or who is a ward of a tribal court. 25 U.S.C. § 1911(a) (1994). Under section 1911(b), the state courts and the tribal courts enjoy concurrent jurisdiction over proceedings for the foster care placement of, or termination of

parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe. 25 U.S.C. § 1911(b) (1994); *Holyfield*, 490 U.S. at 36, 104 L. Ed. 2d at 38-39, 109 S. Ct. at 1601-02. In such cases, however, the state court must transfer the proceeding to the tribal court upon the petition of the tribe or a parent, absent "good cause," objection by either parent, or declination of jurisdiction by the tribal court. 25 U.S.C. § 1911(b) (1994); *Holyfield*, 490 U.S. at 36, 104 L. Ed. 2d at 38-39, 109 S. Ct. at 1601-02.

The ICWA further provides that "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe *** of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a) (1994). For purposes of the ICWA, "Indian child" means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (1994). A violation of sections 1911 or 1912 of the ICWA may be cause to invalidate the child custody proceeding. See 25 U.S.C. § 1914 (1994). The Bureau of Indian Affairs has promulgated nonbinding guidelines to aid state courts in the appropriate application of the ICWA. *Guidelines for State Courts: Indian Child Custody Proceedings*, 44 Fed. Reg. 67,584 (1979) (hereafter *Guidelines*); *Holyfield*, 490 U.S. at 51 n.26, 104 L. Ed. 2d at 48 n.26, 109 S. Ct. at 1609 n.26.

Mark contends that, despite evidence that C.N. may be an "Indian child," the circuit court failed to make a determination as to the applicability of the ICWA. Mark argues that the absence of such a determination can cre-

ate jurisdictional issues, rendering the termination proceeding and any subsequent adoption proceeding void. The appellate court rejected this argument. The appellate court held that Mark, as the party asserting the applicability of the ICWA, had the burden to produce the necessary evidence for the circuit court to determine if C.N. is an "Indian child," that Mark failed to satisfy this burden, and that the circuit court did not err by failing to apply the act. See *In re A.G.-G.*, 899 P.2d 319, 322 (Colo. App. 1995). We agree that the circuit court did not err.

Mark never asserted the applicability of the ICWA before the circuit court, and on appeal, cites only two brief references in the record touching on the subject of his alleged Indian heritage. The first reference is found in the testimony of DCFS caseworker Amelia Apperson. During the termination hearing, the State asked Apperson on direct examination to describe Mark's "focus" during discussions with him. Apperson testified that, at one point, Mark was concerned because, according to him, he was part of a Native American tribe. Mark asked Apperson to pursue the matter of whether his family was registered with the tribe. Apperson testified that she "had to pursue" the matter, which she did. Mark did not testify at the termination hearing, and no other witness testified on this subject.

The second reference in the record cited by Mark is found in a 14-page psychological assessment prepared by consulting psychologist Donald R. Pearson. Pearson's assessment is part of a 125-page report DCFS filed with the circuit court 10 months prior to the termination hearing. Pearson states that Mark identified himself as the son of a "full-blooded Blackfoot Indian." Although not cited by Mark, Pearson later states in his assessment that Mark "claimed to be an American Indian (although the collateral information provided by the caseworker indicated this was not the case)."

We conclude that the brief references in the record to Mark's unsubstantiated statements concerning his alleged Indian heritage were simply insufficient to implicate the provisions of the ICWA. The circuit court had no reason to believe that C.N. may be an Indian child and no reason to raise the issue. Accordingly, the circuit court did not err in failing to make a determination on the record as to the applicability of the act and properly exercised jurisdiction over this matter. See *In re M.S.*, 302 Ill. App. 3d 998, 1001-02 (1999) (holding that circuit court properly exercised jurisdiction over a proceeding to terminate parental rights where the court was presented, in an eleventh-hour motion, with only the unsubstantiated assertion by respondent-mother that children were of Native American heritage); *In re M.N.W.*, 577 N.W.2d 874, 876-77 (Iowa App. 1998) (holding that, in view of the scant evidence of the father's Native American heritage, trial court did not err in failing to determine at the outset of the proceedings whether the ICWA applied); *In re Appeal in Maricopa County Juvenile Action No. A—25525*, 136 Ariz. 528, 532 n.3, 667 P.2d 228, 232 n.3 (1983) (noting that the court is not required to make a finding regarding the status of the child as Indian or non-Indian in every child custody proceeding, but only where the court has reason to believe that an Indian child may be involved); *Guidelines*, 44 Fed. Reg. at 67,586, par. B.1(c) (setting forth circumstances under which a state court has reason to believe a child involved in a custody proceeding is an Indian child).

Mark's reliance on *In re C.H.*, 510 N.W.2d 119 (S.D. 1993), and *In re J.W.*, 498 N.W.2d 417 (Iowa App. 1993), is misplaced. In *C.H.*, the South Dakota Department of Social Services admitted, in its original neglect petition, that the ICWA may be applicable because respondent-mother "is believed to be one-half Choctaw," a tribe federally recognized in Mississippi, and that she and her

children, therefore, may be eligible for membership in the tribe. *C.H.*, 510 N.W.2d at 123. In the instant case, there is no similar admission as to the applicability of the ICWA, no admission as to C.N.'s eligibility for membership in a recognized tribe, and no asserted belief in Mark's alleged Indian heritage.

In *J.W.*, there was undisputed evidence that the children were "Indian children" under the ICWA, and the trial court ruled that the act applied to the proceedings. In the State's subsequent petition for termination of parental rights, the State alleged that the children were Indian children within the meaning of the act. The only issue decided on appeal was whether the State complied with the notice provisions of the ICWA. The Iowa court of appeals held that the State had not complied, and remanded the matter for further proceedings. *J.W.*, 498 N.W.2d at 421-22. Here, there is no such undisputed evidence that C.N. is an "Indian child," and no allegation by the State, or any other party to the circuit court proceedings, that the ICWA applies. Further, Mark does not argue on appeal that, under the facts and circumstances of this case, the State ran afoul of the notice provisions of the ICWA. See 25 U.S.C. § 1912(a) (1994).

For the foregoing reasons, we reject Mark's argument that a remand to the circuit court is necessary to consider the applicability of the ICWA, and agree with the appellate court's decision on this issue.

## II. Parental Unfitness

We next consider the State's contention that the appellate court erred in reversing the judgment of the circuit court terminating respondents' parental rights to C.N. The circuit court found that respondents were unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1996)), in that they failed to make reasonable progress toward the return of C.N. within 12 months of the adjudication of neglect, and that it is in C.N.'s best interests that respondents' parental rights be terminated.

The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship. See *Santosky v. Kramer*, 455 U.S. 745, 758-59, 71 L. Ed. 2d 599, 610, 102 S. Ct. 1388, 1397 (1982); *In re Adoption of Syck*, 138 Ill. 2d 255, 274 (1990); 750 ILCS 50/17 (West 1998). Accordingly, proof of parental unfitness must be clear and convincing. *Syck*, 138 Ill. 2d at 275; *In re Enis*, 121 Ill. 2d 124, 129-31 (1988); 705 ILCS 405/2—29(2) (West 1998); 750 ILCS 50/8(a)(1) (West 1998). In order to reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, the reviewing court must conclude that the trial court's finding was against the manifest weight of the evidence. *Syck*, 138 Ill. 2d at 274. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 141-42 (1986).

The appellate court in the instant case held that it was clearly evident that respondents made reasonable progress toward the return of C.N. and, therefore, the circuit court's finding of unfitness under section 1(D)(m) of the Adoption Act was contrary to the manifest weight of the evidence. The State maintains that the appellate court applied the wrong standard in measuring respondents' progress, and that under the appropriate standard, the State presented clear and convincing evidence of respondents' unfitness. Our determination of the appropriate standard for measuring progress under section 1(D)(m) of the Adoption Act necessarily involves statutory interpretation, a question of law. Review of this issue, therefore, proceeds *de novo*. See *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000).

The Adoption Act expressly provides that it "shall be construed in concert with the Juvenile Court Act of 1987

[705 ILCS 405/1—1 *et seq.* (West 1998)]." 750 ILCS 50/ 2.1 (West 1998). The Juvenile Court Act sets forth, among other things, the procedures to be followed in cases, such as the present one, involving abused, neglected or dependent minors. 705 ILCS 405/2—1 through 2—33 (West 1998). The overriding purpose of the Juvenile Court Act is to ensure that the best interests of the minor, the minor's family, and the community are served. *In re W.C.*, 167 Ill. 2d 307, 320 (1995); 705 ILCS 405/1—2 (West 1998).

Under section 2—29 of the Juvenile Court Act, where a court finds that it is in the minor's best interest to do so, a court may terminate parental rights "after finding, based upon clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act." 705 ILCS 405/2—29(2) (West 1998). At the time of the circuit court proceedings in this case, section 1 of the Adoption Act provided in relevant part:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following:
>
> * * *
>
> (m) Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make *reasonable progress toward the return of the child* to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under Juvenile Court Act or the Juvenile Court Act of 1987." (Emphasis added.) 750 ILCS 50/1(D)(m) (West 1996).[4]

In the present case, a panel of the Second District of the appellate court held that a parent's progress toward the return of the child is measured from the situation that gave rise to the child's removal, and not whether

---

[4]Although the legislature has amended section 1(D)(m) multiple times, the statute retains the "reasonable progress" language. See 750 ILCS 50/1(D)(m) (West Supp. 1999).

the parent meets goals outlined by DCFS. The court explained that placing undue emphasis on compliance with DCFS service plans would unfairly elevate administrative means over statutory ends, and could result in the termination of parental rights based only on the parent's failure to complete tasks in the DCFS service plan that were not necessarily related to the previously established parental shortcoming. The appellate court further held that, in light of the conditions which existed when C.N. was removed, rather than the recommendations made by DCFS, it is clearly evident that respondents made reasonable progress toward C.N.'s return. The appellate court reversed the trial court's order terminating respondents' parental rights.

The State maintains that the Second District appellate court construed section 1(D)(m) too narrowly, by focusing solely on the conditions that gave rise to the removal of C.N. and ignoring other parental deficiencies, as addressed in the DCFS service plans and the circuit court's directives. The State argues that the correct standard by which to measure a parent's progress is the standard adopted by another district of the appellate court. That court has held that the measure of reasonable progress encompasses those conditions which *could give rise* to a finding of abuse or neglect, not merely those conditions which led to the initial removal of the minor, and that the standard by which progress should be measured is parental compliance with the court's directives, the DCFS service plan, or both. *In re C.S.*, 294 Ill. App. 3d 780, 792 (4th Dist. 1998).

Our analysis begins, as it must, with the language of the statute. See *In re D.L.*, 191 Ill. 2d 1, 9 (2000). The grounds for unfitness set forth in section 1(D)(m) of the Adoption Act are phrased in the disjunctive. Thus, section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make rea-

sonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child. See *People v. Frieberg*, 147 Ill. 2d 326, 349 (1992) (ordinary disjunctive use of "or" indicates a choice between alternatives); *In re S.G.*, 216 Ill. App. 3d 668, 670 (1991) ("as the language of subsection 1D(m) is in the disjunctive, either a failure to make reasonable efforts *or* reasonable progress can be grounds for an adjudication of unfitness" (emphasis in original)); accord *In re Drescher*, 91 Ill. App. 3d 658, 666 (1980). We examine the "reasonable progress" provision in this case.

The Adoption Act does not define "progress." In the absence of a statutory definition indicating a different legislative intent, we ascribe to a word its ordinary and popularly understood meaning. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 477-78 (1998); *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15 (1991). "Progress" ordinarily denotes movement or advancement toward a goal. Webster's Third New International Dictionary 1813 (1993). The goal set forth in the statute is "the return of the child." Consistent with the statutory language, our appellate court has repeatedly read this provision of section 1(D)(m) to require "demonstrable movement toward the goal of reunification." See, *e.g.*, *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000); *In re K.P.*, 305 Ill. App. 3d 175, 180 (1999); *In re L.N.*, 278 Ill. App. 3d 46, 50 (1996); *In re M.C.*, 201 Ill. App. 3d 792, 798 (1990); *In re Allen*, 172 Ill. App. 3d 950, 956 (1988). Under the statute's express language, a parent's progress toward this goal is judged under the familiar "reasonableness" standard.

The statute, however, does not expressly set forth how progress is actually made or measured. That is, the statute does not explain what steps are necessary to reach the goal of "the return of the child." There must

be a yardstick or, as some courts have called it, a "benchmark," against which to measure a parent's progress. See, *e.g.*, *L.N.*, 278 Ill. App. 3d at 50-51; *In re A.P.*, 277 Ill. App. 3d 592, 598 (1996); *In re S.J.*, 233 Ill. App. 3d 88, 119 (1992). Without such a benchmark, it is impossible to determine whether any progress—reasonable or otherwise—has been made.

Decisions from our appellate court are not in agreement as to the appropriate benchmark. Some appellate court decisions, like the one in this case, have measured progress by looking at the degree to which a parent has corrected the situation which triggered the minor's initial removal or the conditions existing at the time custody is taken. See *L.N.*, 278 Ill. App. 3d at 50-51; *S.G.*, 216 Ill. App. 3d at 669-70; *In re M.W.*, 199 Ill. App. 3d 1050, 1056 (1990); *In re Henry*, 175 Ill. App. 3d 778, 790-91 (1988); *Allen*, 172 Ill. App. 3d at 956; *In re Bennett*, 80 Ill. App. 3d 207, 212 (1980). Other appellate court decisions have held that once the court, or an authorized agency like DCFS, decides what steps a parent must take to achieve the return of the child, subsequent inquiry into a parent's progress should focus on the parent's compliance with the DCFS service plan, the court's directives, or both. According to these decisions, the steps outlined for the parents in the service plan and/or the court's orders should be designed to remedy not only the parental deficiency which was the basis for the child's removal, but other parental deficiencies later identified which would prevent return of the child. See *C.S.*, 294 Ill. App. 3d at 787-88; *In re L.L.S.*, 218 Ill. App. 3d 444, 463-64 (1991). Still other decisions have attempted to reach a middle ground. In *S.J.*, for example, the appellate court held that the "crucial consideration is the actual progress made from the conditions at the time of the neglect adjudication," but explained that a parent's failure to follow DCFS service plans or the court's directives is not

necessarily irrelevant to an evaluation of whether the parent made "substantial progress" under the statute. *S.J.*, 233 Ill. App. 3d at 120-21. See also *In re D.D.*, 309 Ill. App. 3d 581, 586-88 (2000), *appeal allowed*, 189 Ill. 2d 658 (2000) (holding that the focus must remain on the respondents' abilities as parents relative to the needs of the children, and rejecting an approach which focuses solely on whether the respondent complied with DCFS service plans).

We reject the narrow view that a court may only look to the situation that triggered the minor's initial removal, or the conditions existing at the time custody is taken, in measuring a parent's progress under section 1(D)(m) of the Adoption Act. As noted earlier, section 1(D)(m) sets forth two independent grounds for a finding of unfitness. The first ground is "[f]ailure by a parent to make *reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent.*" (Emphasis added.) 750 ILCS 50/1(D)(m) (West 1996). Had the legislature also intended the "reasonable progress" ground to be limited to the "conditions that were the basis for the removal of the child from the parent," the legislature could have included this language. It did not do so, and we will not read such a limitation into the statute. See *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999) (court will not read into a statute exceptions, limitations or conditions that the legislature did not express).

We reject this narrow view of the reasonable progress ground for the additional reason that it erroneously assumes that the condition which triggered removal of the child is the *only* condition a parent need ever address in order to achieve the goal of reunification. The parent-child relationship, the environment in the home, and the precise conditions which triggered State intervention do not remain static over time. Thus, the relevant issues are

not "frozen" at the moment custody of the child is taken. See *C.S.*, 294 Ill. App. 3d at 793.

In addition, other serious conditions, existing at the time the child is removed, may become known only after removal, following further investigation of the child, parent and family situation. As one court observed, "[W]hat may appear to be a momentary lapse in parental judgment can turn out to be a symptom of more profound emotional, psychological, or even psychiatric problems which impair the performance of parental duties," but which come to light only with further investigation. *C.S.*, 294 Ill. App. 3d at 789.

The necessity of considering other conditions that later come to light is reflected in the broad scope of the investigation authorized under the Juvenile Court Act. Under section 2—21, following a court's determination of abuse, neglect or dependency, the court may order an investigation concerning the "minor's physical and mental history and condition, family situation and background, economic status, education, occupation, history of delinquency or criminality, personal habits, and any other information that may be helpful to the court" at the dispositional hearing. 705 ILCS 405/2—21(2) (West 1998). We note, too, that under the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 1998)), service plans prepared by DCFS are not limited to addressing the condition which triggered the minor's removal. Rather, the service plans must reasonably relate to "remedying a condition or conditions that gave rise *or which could give rise* to any finding of child abuse or neglect." (Emphasis added.) 325 ILCS 5/8.2 (West 1998).

In construing section 1(D)(m) of the Adoption Act, we also reject the equally narrow view that, in measuring a parent's progress toward the return of the child, a court should focus solely on the parent's compliance with DCFS service plans.

We recognize that the service plans are an integral part of the statutory scheme. Indeed, at the adjudicatory hearing, "[i]f the court finds that the child has been abused, neglected or dependent, the court shall admonish the parents that they must cooperate with the Department of Children and Family Services, comply with the terms of the service plan, and correct the conditions that require the child to be in care, or risk termination of parental rights." 705 ILCS 405/2—21(1) (West 1998). See also 705 ILCS 405/2—22(6) (West 1998) (requiring essentially the same admonishment at the dispositional hearing). Had the legislature, however, intended a parent's progress toward the return of the child to be measured by looking only to the parent's compliance with the service plans, the legislature could have included language to that effect in the statute. It did not do so.

Moreover, in construing section 1(D)(m), we must assume the legislature did not intend to produce an unjust result. See *Baker v. Miller*, 159 Ill. 2d 249, 262 (1994). Although service plans, by statute, must reasonably relate to "remedying a condition or conditions that gave rise or which could give rise to any finding of child abuse or neglect" (325 ILCS 5/8.2 (West 1998)), mechanical application of a rule that measures a parent's progress only in terms of compliance with the service plans could produce unjust results.

First, to the extent a service plan deviates from this statutory requirement, a parent could be found unfit merely for failing to comply with administrative directives unrelated to remedying a condition which would prevent return of the child. Second, even where the service plan satisfies the statutory requirements, a parent could be found unfit simply for failing to complete individual service plan tasks which, standing alone, would be insufficient to prevent return of the child. A parent could

also be found unfit where, although the parent attained the goal established by DCFS, the parent did not follow the specific directives set forth in the service plan. This cannot be what the legislature intended.

We do not suggest that the service plans routinely deviate from the statutory requirements; we have no reason to so conclude. Nor do we suggest that a parent's compliance with individual service plan tasks is unimportant; the statutory scheme demonstrates otherwise. We emphasize only that, in light of the "deep human importance" of parental rights and responsibilities (*In re Paul*, 101 Ill. 2d 345, 351-52 (1984)), and the fundamental liberty interest at stake (*Santosky*, 455 U.S. at 753, 71 L. Ed. 2d at 606, 102 S. Ct. at 1394-95), courts must take care to ensure that the statutory requirements for service plans are met in every case, and that the overall focus in evaluating a parent's progress toward the return of the child remains, at all times, on the fitness of the parent in relation to the needs of the child.

As the foregoing discussion indicates, the benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act must take into account the dynamics of the circumstances involved; the reality that the condition resulting in removal of the child may not be the only, or the most severe, condition which must be addressed before custody of the child can be returned to the parent; the appropriate role of service plans in addressing these conditions; and the overriding concern that a parent's rights to his or her child will not be terminated lightly. Accordingly, we hold that the benchmark for measuring a parent's "progress toward the return of the child" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known

and which would prevent the court from returning custody of the child to the parent. We believe this result is consistent with the overriding purpose of the Juvenile Court Act (705 ILCS 405/1—2 (West 1998)), and naturally follows from the language of section 1(D)(m), when read in conjunction with the other statutory provisions discussed above.

This result is also consistent with recent amendments to section 1(D)(m). The statute now additionally provides that, "[i]f a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes *** the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care ***." 750 ILCS 50/1(D)(m) (West Supp. 1999). Although we are not called upon to construe this statutory language, we note that it underscores what we hold here: namely, that compliance with DCFS service plans is intimately tied to a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to "substantially" fulfill the terms of that service plan.

As indicated earlier, the appellate court in the present case held that progress is measured from the situation which gave rise to the child's removal, and not whether the parent meets goals outlined by DCFS. In light of our holding above, we conclude that the appellate court, in reviewing the circuit court's finding of unfitness, erred in its statement of the law. Although we

disapprove of the appellate court's decision, before deciding whether to reverse the same and, consequently, to affirm the decision of the trial court terminating respondents' parental rights, we must consider the evidence introduced at the termination hearing and whether the circuit court's finding of unfitness was against the manifest weight of the evidence. See *Syck*, 138 Ill. 2d at 278 (where appellate court misconstrued its role in reviewing correctness of unfitness finding, review of the evidence was necessary before determining whether appellate court decision required reversal).

Preliminarily, we note that this court, in *In re D.L.*, 191 Ill. 2d 1, 10 (2000), held that section 1(D)(m) of the Adoption Act limits the evidence that may be considered, with respect to this ground of unfitness, to matters concerning the parent's conduct in the 12 months after the applicable adjudication of neglect, abuse or dependency. In *D.L.*, however, we did not consider the unusual situation present here, where, based on the stipulations of the parents, the minor was adjudged neglected on two separate dates.

On January 3, 1995, the circuit court adjudged C.N. a neglected minor as to Diane only. This adjudication related to the allegations of physical abuse contained in the State's original petition for adjudication of wardship. The State later filed a second petition containing allegations of sexual abuse. At the time the State filed its first and second petitions, Marin was the reported father of C.N. After test results established paternity in Mark, the State amended both petitions to name Mark as C.N.'s father. Shortly thereafter, on June 5, 1996, Diane and Mark stipulated that, as alleged in the State's amended petitions, S.S. and C.N. were sexually abused by Marin, S.S. was physically abused by Marin, and Diane caused or allowed such physical abuse to occur. Based on these stipulations, the circuit court adjudged C.N. a neglected and abused minor as to both Diane and Mark.

The termination hearing in this case took place long before our decision in *D.L.*, and the circuit court allowed the introduction of evidence of Diane's conduct during the entire three-year period from the first neglect adjudication on January 3, 1995, through the commencement of the termination hearing on February 3, 1998. Under *D.L.*, we may only consider evidence of Diane's conduct during the 12-month period following the relevant adjudication of neglect or abuse. *D.L.*, 191 Ill. 2d at 10. Although C.N. was adjudged neglected, as to Diane, on two occasions, the State's petition for termination of parental rights expressly refers only to the first neglect adjudication on January 3, 1995. We need not decide, however, whether the relevant 12-month period began on January 3, 1995, or on June 5, 1996, the date of the second neglect adjudication. As discussed below, whether we consider the evidence of Diane's conduct during either or both of these periods, we hold that the circuit court's determination that Diane was unfit is not against the manifest weight of the evidence.[5]

As to Mark, it is clear that under *D.L.* we may consider only evidence of Mark's conduct during the 12-month period following the second neglect adjudication on June 5, 1996. Although the State's petition for termination of parental rights did not specifically refer to this date, the record of the circuit court proceedings reveals that the parties and the court were well aware that C.N. was not adjudged neglected, as to Mark, until June 5, 1996. In addition, we note that Mark raised no issue before this court related to the State's failure to

---

[5]Subsequent amendments to section 1(D)(m) of the Adoption Act have shortened the relevant post-adjudication period to nine months, and have added language indicating that unfitness includes the failure to make reasonable progress "during *any* 9-month period after the end of the initial 9-month period." (Emphasis added.) 750 ILCS 50/1(D)(m) (West Supp. 1999).

clarify, in its petition for termination of parental rights, that only the June 5, 1996, neglect adjudication was applicable to him.

With these strictures in mind, we begin our review of the evidence by turning to the DCFS service plans. The appellate court concluded that, although the service plans may have contained goals designed to improve the general conditions of respondents' home, the record did not establish that the service plan goals corrected the conditions that were the basis of the removal of C.N. Underlying this conclusion is the appellate court's view that once Marin ceased to reside with respondents, the condition that triggered C.N.'s removal was resolved. We disagree.

The condition or conditions which led to the physical abuse of S.S., which placed C.N. at risk, and which led to the sexual abuse of both minors, encompass more than Marin's presence in the home. Three adults were involved, and two of them—respondents—failed to protect S.S. and C.N. from abuse. Respondents told a DCFS investigator that they had each witnessed Marin hit S.S. prior to the first hot line call in July 1994. Diane admitted to a DCFS investigator that S.S. had been sexually abused, and stipulated that she failed to protect S.S. Respondents both stipulated that C.N., who was five months old at the time DCFS took her into protective custody, had been sexually abused. Under the circumstances of this case, we believe the service plans and the court's orders, which required respondents to participate in sexual abuse counseling and exhibit appropriate parenting skills, were reasonably related to remedying the conditions which led to the removal of C.N.

In addition, the record indicates that at the time of C.N.'s removal, the family was living in a small motel room. There was also evidence that Marin abused alcohol. We believe, therefore, that the service plan requirement that respondents obtain alcohol and substance abuse

evaluations and maintain an appropriate residence were also reasonably related to remedying conditions existing at the time of C.N.'s removal.

We turn now to the evidence of respondents' conduct during the relevant post-adjudication periods. Although the evidence is set out in considerable detail earlier in this opinion, we provide a brief overview.

### Diane N.

Following the establishment of the initial service plan and the January 3, 1995, adjudication, Diane initially complied with the court's orders and the service plan tasks. By February 1995, Diane had obtained a substance abuse evaluation, started counseling, and was attending, or about to attend, parenting classes. Diane also obtained a psychological evaluation, with a recommendation that she continue in counseling to address issues of poor judgment and parenting style. Diane's attendance in counseling, however, was inconsistent, and by July 1995, Diane was taking an adversarial role with DCFS.

In August 1995, DCFS caseworker Amelia Apperson rated Diane's progress toward the service plan goal of "return home" unsatisfactory. Diane was uncooperative; she was not regularly participating in counseling; she continued to deny any responsibility for the abuse of her children; and although she completed a parenting class, she failed to exhibit appropriate parenting skills during visits with C.N.

Diane made little progress in in-home parenting classes which began in late August 1995. Diane was not cooperative, her attendance was sporadic, and she failed to put into practice concepts learned in class. Diane's dissatisfaction with DCFS was an issue at almost every session.

During late 1995, Diane's visits with C.N. were going poorly, and Diane frequently terminated the visits early. According to the DCFS supervisor, Diane did not have the endurance to work with C.N.

Psychologist James Jorgenson testified that Diane expressed only a perfunctory concern for the safety of C.N. Similarly, Amy Unterborn, Diane's counselor during 1995, testified that Diane did not demonstrate the skills necessary to create a safe environment for her children. In addition, Unterborn testified that although Diane admitted she had exposed S.S. and C.N. to an inadequate environment, Diane failed to recognize the emotional impact of the abuse on C.N. and that her daughters would suffer long-term consequences due to the abuse. According to Unterborn, Diane could have made more progress in counseling, had she focused more on developing necessary skills and less on her anger with DCFS and her desire to manipulate the system.

Following the development of the August 1996 service plan, Diane continued to resist DCFS intervention. Although she subsequently agreed to participate in counseling, in March and April of 1997, she failed to follow through with an assessment at Family Advocate, an agency which specializes in the treatment of sexual abuse and provides counseling to address issues related to the parenting of a child who has been abused.

The record evinces a failure by Diane, during the 12 months following the January 3, 1995, adjudication, to comply with the terms of the service plan, as ordered by the circuit court, and participate meaningfully in available services. Diane focused upon her anger and hostility toward DCFS, all the while disclaiming any responsibility for the abuse of C.N. Even after the second adjudication of abuse and neglect, Diane continued to oppose DCFS intervention and failed to follow through on sexual abuse counseling. Based on this record, we conclude that the circuit court's finding that Diane was unfit for failure to make reasonable progress toward C.N.'s return is not against the manifest weight of the evidence.

Diane maintains that the trial court erred in admit-

ting the testimony of psychologist James Jorgenson, who conducted a bonding assessment in late 1995. Diane argues that Jorgenson's testimony related only to the issue of whether the continued existence of the parent-child relationship was in C.N.'s best interests—a consideration irrelevant in determining Diane's fitness. See *Syck*, 138 Ill. 2d at 276. Jorgenson's testimony was relevant to the issue of Diane's ability to parent C.N. and provide a safe environment. Thus, we disagree with Diane's characterization of his testimony, and conclude that the trial court did not abuse its considerable discretion in admitting Jorgenson's testimony. See *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 169 (1994) (admission of evidence is within the sound discretion of the trial court and will not be reversed on review absent a clear showing of abuse of discretion).

## Mark N.

Although Mark participated in some services prior to the establishment of paternity, we focus only on Mark's conduct in the year following the June 5, 1996, neglect adjudication.

During this period, the record indicates that DCFS caseworker Amelia Apperson was concerned about Mark's ability to parent C.N. By his own admission, he had been involved in C.N.'s life prior to DCFS involvement. C.N., however, was developmentally delayed due to a prior lack of stimulation and nurturing. Mark minimized the impact of the abuse on C.N. and took a simplistic view of her needs, not appreciating that C.N. required serious therapy, structure, and care. In August 1996, Apperson rated Mark's progress in demonstrating adequate parenting skills unsatisfactory. Apperson's rating was based on her own observations and reports from the visit supervisor and the in-home educator. Apperson also noted, in her written evaluation, that Mark "has not

cooperated with DCFS," that he has, "at times *** become verbally abusive to DCFS workers, the foster parents and other service providers," and that he has not signed any releases of information, including those necessary "to make referrals for *** counseling for family members whose children have been sexually abused." The circuit court had ordered Mark to participate in counseling for family members of sexual offenders.

The adversarial role Mark assumed with DCFS continued beyond the immediate post-adjudication period into 1997. Mark persisted in his belief that he and Diane should not have been "indicated," and was reluctant to engage in recommended services. Although Mark eventually obtained alcohol and psychological assessments, he failed to attend any appointments at Family Advocate, notwithstanding his prior agreement and the circuit court's order. The only counseling in which Mark participated was a telephone service of which DCFS had no information and had not approved.

In light of this evidence, we conclude that the trial court's determination that Mark was unfit for failing to make reasonable progress toward the return of C.N. is not against the manifest weight of the evidence; the opposite conclusion is not clearly evident. We reject Mark's argument that the trial court penalized him for Diane's conduct. We believe the record sufficiently demonstrates Mark's lack of progress, independent of Diane's conduct.

As a final matter, we note that the parties have not raised any issues involving the "best interests" hearing, the second stage of the proceeding to terminate respondents' parental rights. See 705 ILCS 405/2—29(2) (West 1998); *Syck*, 138 Ill. 2d at 276-77. Therefore, in light of our conclusion that the circuit court's finding of unfitness is not against the manifest weight of the evidence, we reverse the judgment of the appellate court and affirm the judgment of the circuit court terminating respondents' parental rights to C.N.

## CONCLUSION

For the above reasons, we reverse the appellate court judgment, which reversed the circuit court's order terminating respondents' parental rights to C.N., and affirm the circuit court judgment.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*