NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190370-U

NO. 4-19-0370

FILED
November 8, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* Ke.A. and Ky.A, Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 14JA72 |
| v. | ) | |
| Kristy W., | ) | Honorable |
| Respondent-Appellant). | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, concluding the trial court's unfitness finding was
not against the manifest weight of the evidence.

¶ 2   Respondent mother, Kristy W., appeals from the trial court's order terminating
her parental rights to Ke.A. (born May 7, 2006) and Ky.A. (born August 25, 2008). On appeal,
respondent argues the trial court's finding she was an unfit parent was against the manifest
weight of the evidence. We disagree and affirm.

¶ 3                              I. BACKGROUND

¶ 4   Respondent and Darrell A. are the biological parents of Ki.A. (born September
28, 2001), Ke.A., and Ky.A. Respondent is also the biological mother to M.W. (born April 30,
1998). Darrell A., M.W., and Ki.A. are not involved in this appeal.

¶ 5   In October 2014, the State filed a petition alleging the minors were neglected,

which it later amended. In the amended petition, the State alleged the minors resided in an environment injurious to their welfare when they resided with respondent and her husband, Darrell A., as that environment exposed them to domestic violence (705 ILCS 405/2-3(1)(b) (West 2012)).

¶ 6        In December 2014, the trial court entered an adjudicatory order finding the minors to be neglected. In January 2015, the court entered a dispositional order finding (1) respondent fit, able, and willing to provide for the minors and (2) Darrell A. unfit and unable to care for the minors. The court placed guardianship of the children with the Department of Children and Family Services (DCFS) and ordered custody of the children to remain with respondent.

¶ 7        On May 16, 2017, the trial court entered a permanency order finding respondent unfit and unable to care for the minors. The court removed custody from respondent and placed it with DCFS.

¶ 8        In April 2018, the State filed a motion to terminate both respondent's and Darrell A.'s parental rights to the minors. The State alleged respondent and Darrell A. were unfit parents as they failed to make reasonable progress toward the return of the minors to their care within a nine-month period following the adjudications of neglected, namely April 16, 2017, to January 16, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2016)). The State further alleged it was in the minors' best interests to terminate respondent's and Darrell A.'s parental rights and appoint DCFS as guardian with the power to consent to adoption.

¶ 9        On September 5, 2018, the trial court entered an adjudicatory order finding (1) respondent had not been proven to be unfit and (2) Darrell A. had been proven to be unfit. As to respondent, the court's finding was based on its belief the State's petition was deficient as a

matter of law as respondent retained "legal custody" of the minors during a portion of the relevant nine-month period. The court later terminated Darrell A.'s parental rights to the minors, a decision which we affirmed on appeal. *In re Ke.A.*, 2019 IL App (4th) 180730-U, ¶ 53.

¶ 10　　　　　On September 18, 2018, the State filed a new motion to terminate respondent's parental rights to the minors, which it later amended. In the amended motion, the State alleged respondent was an unfit parent as she (1) failed to make reasonable progress toward the return of the minors to her care within a nine-month period following the adjudications of neglected, namely May 16, 2017, to February 16, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2016)); and (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2016)). The State further alleged it was in the minors' best interests to terminate respondent's parental rights and appoint DCFS as guardian with the power to consent to adoption.

¶ 11　　　　　In December 2018, the trial court commenced a fitness hearing. The hearing was continued three times, with the court ultimately ruling in April 2019. The following is gleaned from the evidence presented at the hearing.

¶ 12　　　　　Carolyn Johnson, a child welfare advanced specialist with DCFS, testified she was assigned to the minors' case from approximately March 2014 until October 2017, at which time the minors' case was transferred from DCFS to Lutheran Social Services of Illinois (Lutheran). Johnson testified respondent was required to complete a substance-abuse assessment, attend visitation with the minors, receive counseling, comply with prescribed medication, maintain employment, and maintain contact with DCFS.

¶ 13　　　　　In May 2016, respondent completed a substance-abuse assessment, which resulted

in services not being recommended. While services were not recommended, respondent was required to comply with randomized drug drops. Johnson testified respondent was "very inconsistent" in complying with the ordered drug drops. Respondent reported she had difficulty complying with the drug drops because of transportation issues. Johnson offered respondent an alternative means of transportation, which respondent declined. Respondent later reported she declined the offer because she did not want to ride in a car with strangers due to her anxiety.

¶ 14　　　　Johnson testified respondent repeatedly reported she was not in contact with her husband. On June 30, 2017, Johnson made an unannounced visit to respondent's home and discovered respondent's husband was sitting in the yard. Respondent's husband ran away upon seeing Johnson.

¶ 15　　　　In August 2017, respondent reported to Johnson an incident of domestic violence occurred between her and her husband and that she had gone to Florida after it occurred. While respondent had previously completed domestic-violence treatment at Cognition Works in February 2015, Johnson re-referred respondent due to the additional domestic-violence incident. Later that fall, a second incident of domestic violence occurred between respondent and her husband, which involved the police. On October 13, respondent called Johnson to inform her about the incident and that she was again in Florida and had been since October 7. While in Florida, respondent did not participate in any services. Respondent also failed to comply with her medication due to the lack of a primary physician or psychiatrist in Florida. Johnson believed respondent had not had visitation with the minors since September 23, 2017. Johnson informed respondent her case would be impacted by her presence in Florida.

¶ 16　　　　Johnson testified she had difficulty keeping in touch with respondent, despite

numerous phone calls, mailed letters, unannounced visits, and visits to the home of respondent's mother.

¶ 17 Johnson referred respondent for counseling services. Respondent attended those services but had attendance issues and never completed services.

¶ 18 Between May and October 2017, respondent reported she was employed in a seasonal job. She also reported to working periodically for a friend's cleaning company, where she was paid cash. Johnson testified respondent did not present any proof of employment.

¶ 19 Johnson testified respondent called her on October 30, 2017, from Florida and asked her what she needed to do to get back into services. Johnson informed respondent she would have to restart domestic-violence services and attend visitation with the minors. Johnson referred respondent to Cognition Works for domestic-violence services. She also referred respondent to Carter Transportation Services to arrange third-party visitation.

¶ 20 Prior to ending her involvement with the minors' case, Johnson transferred respondent's contact information to the new caseworker at Lutheran.

¶ 21 Bettina Garner Earl testified she was employed by Community Resource Center and interacted with respondent between May 2016 and early May 2017 for individual therapy. Earl testified respondent was referred for biweekly individual therapy sessions. Earl stated the goal of counseling was to address the domestic-violence issues and respondent's anxiety. Respondent was ultimately released from services due to a lack of attendance. Throughout her involvement, respondent reported she had not had contact with her husband. Earl admitted that if respondent had told her she was still in contact with her husband, she would have altered the treatment plan to address respondent's domestic-violence issues.

¶ 22    Sabrina Medina testified she was the minors' paternal aunt and had been their foster parent since July 25, 2017. During the summer and fall of 2017, Medina supervised visits involving the minors and respondent and respondent's husband. During a September 23, 2017, supervised visit, respondent persisted in wanting to take the minors to see their grandmother in another town, which respondent was not allowed to do, and became involved in an argument with her husband at dinner. Medina described respondent's behavior as "belligerent." She also noted respondent's speech was unclear and she was having issues communicating. Based on respondent's behavior, Medina believed respondent was intoxicated during the visit.

¶ 23    Champaign County sheriff's deputy Devon Watkins testified she was called to respondent's home on October 1, 2017, in response to a physical domestic disturbance. Deputy Watkins observed respondent's husband wearing a tank top that appeared to have been torn. Deputy Watkins also observed respondent had a recent cut on her lip and blood on her hands. Respondent told Deputy Watkins she and her husband had an argument about him locking her out of the house for three days and her attending a party the night before. Respondent attempted to call the police during the argument, but her husband pushed her against the wall and took her phone. Respondent stated she did not know how she got the cut on her lip, admitted to scratching her husband during her attempt to retrieve the phone, and stated she ripped her husband's necklace off. Respondent led Deputy Watkins into the home, where she showed him the wall she was pushed up against, which contained a small amount of dried blood. Deputy Watkins confirmed respondent claimed her husband hit her head against the wall, causing her head to hurt.

¶ 24    Rachel Kramer, a program director at Lutheran, testified she supervised the

minors' case from October 30, 2017, until September 2018, at which time the minors' case was transferred to another supervisor at Lutheran. She also served as the minors' caseworker at various points during that period.

¶ 25 At the time Lutheran received the minors' case from DCFS, respondent was not engaged in services because she was in Florida. A Lutheran caseworker, Madeline Mayers, repeatedly attempted to contact respondent with the contact information provided by DCFS but received no response.

¶ 26 In December 2017, respondent reached out to Lutheran. At that time, Mayers began making the necessary referrals for services. Respondent was referred to complete a substance-abuse assessment. Respondent completed the assessment, which recommended no services. While services were not recommended, respondent was required to comply with randomized drug drops. Kramer testified respondent "[s]ometimes" completed the drops. Kramer recalled at least one positive drug drop around November 2017.

¶ 27 In January 2018, respondent was referred to Cognition Works for domestic-violence services and individual therapy. Respondent began participating in both.

¶ 28 Respondent was required to keep in touch with Lutheran. Kramer testified "[t]here were times when the workers were not able to reach her." Kramer recalled "there were weeks at a time when she didn't have a phone or we would contact her through her husband *** because she didn't have a phone or it was not working or not turned on."

¶ 29 Respondent was required to attend weekly third-party visitation with the minors. Respondent missed some visits, but Kramer could not recall how many. At some point, the visitation changed to agency supervised visits because the minor's foster parent, who was the

third-party visit supervisor, no longer wanted to supervise the visits.

¶ 30         Respondent was required to maintain housing. She did so with her husband.

¶ 31         Respondent was required to maintain employment. She had a job "briefly" through FedEx.

¶ 32         Madeline Mayers, a former caseworker at Lutheran, testified she served as the minors' caseworker from October 2017 until March 2018. Respondent was required to complete domestic-violence, substance-abuse, and parenting services. She was also required to attend visitation with the minors and maintain contact with the agency.

¶ 33         Mayers had difficulties getting in contact with respondent, particularly between October and December 2017. Mayers testified respondent was required to complete drug drops. She missed some drops and tested positive for opiates on November 3, 2017. Respondent failed to attend visitation with the minors between September 23, 2017, and December 2017. When visitation occurred, it went well. In January 2018, respondent and her husband resided together. In March 2018, respondent was still in the process of completing parenting classes and individual therapy.

¶ 34         Jacque Chase, a facilitator for group therapy at Cognition Works, testified she received a referral for respondent in January 2018. Respondent had previously been referred to Cognition Works in March 2015 and completed therapy in February 2016. Respondent completed an "intake" in January 2018, started classes in February 2018, and completed the program in October 2018. Throughout, respondent remained in a relationship with her husband. Chase believed respondent's husband was controlling of respondent and respondent was dependent on her husband. Chase testified respondent minimized the long-term consequences

from being in an abusive relationship. Respondent did, however, make progress in that she developed a sense of self. Chase believed respondent's focus was keeping her family intact.

¶ 35 Grace Mitchell, the director of the Family Advocacy Center, testified, on November 14, 2017, respondent and her husband reported at the center together to work on parenting skills, with the focus being on relationships, life skills, and family dynamics. They also participated together in a domestic-violence group. They completed domestic-violence services in January 2018 and the parenting services in March 2018. At no point did they discuss the specific incidents of domestic violence occurring between the two of them. Mitchell noted respondent's husband was often "the spokesperson for the couple." Mitchell believed respondent had "learned something" based on her self-reported assessment following the completion of services. Mitchell also believed there was "a strong possibility" that the fact they were always together impacted how much respondent could learn from the program.

¶ 36 Urbana police officer Kenneth Sprague testified about a September 18, 2018, traffic stop involving respondent. Respondent was very upset, had slurred speech, was unable to recall where she came from, had difficulty obtaining her driver's license, was unable to locate her insurance without officer assistance, and had the smell of alcohol on her breath. Respondent initially denied drinking or taking any medications. Later, she admitted taking one milligram of Lorazepam and consuming an alcoholic beverage before driving. Officer Sprague administered both "pre-exit" and field sobriety tests. The tests showed signs of impairment. Respondent was placed under arrest. During the inventory search of respondent's vehicle, a cup was discovered in the center console, which contained a trace amount a liquid that smelled like a "sweet" alcoholic beverage. Officer Sprague believed the smell was consistent with the smell on respondent's

breath.

¶ 37        Based on this evidence, the trial court found respondent was an unfit parent as she failed to make reasonable progress toward the return of the minors to her care within a nine-month period following the adjudications of neglected, namely May 16, 2017, to February 16, 2018. The court found the State did not establish respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare.

¶ 38        Following a May 2019 best-interest hearing, the trial court found it was in the minors' best interests to terminate respondent's parental rights. The court entered a written order terminating respondent's parental rights to the minors.

¶ 39        This appeal followed.

¶ 40                            II. ANALYSIS

¶ 41        On appeal, respondent argues the trial court's unfitness finding is against the manifest weight of the evidence. The State disagrees.

¶ 42        The involuntary termination of parental rights involves a two-step process. 705 ILCS 405/2-29(2) (West 2016). First, the State must prove by clear and convincing evidence the parent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the trial court makes a finding of unfitness, the State must then prove by a preponderance of the evidence it is in the child's best interest for parental rights to be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 43        Respondent takes issue only with the trial court's unfitness finding. We will not disturb a trial court's unfitness finding unless it is against the manifest weight of the evidence. *In*

*re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69.

¶ 44 The trial court found respondent was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2016)). Section 1(D)(m)(ii) provides, in part, a parent will be considered an "unfit person" if he or she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected ***." 750 ILCS 50/1(D)(m)(ii) (West 2016).

¶ 45 "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001). This is an objective standard. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227. The benchmark for measuring a parent's progress toward reunification "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17.

¶ 46 In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007). Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Id.* at 1046. In this case, the relevant time period was May 16, 2017, to February 16, 2018.

¶ 47 During the relevant nine-month period, respondent failed to (1) maintain contact with the agencies involved in monitoring the minors' welfare, (2) consistently participate in services, (3) consistently attend visitation with the minors, and (4) complete required drug drops. The evidence also showed respondent tested positive for opiates on at least one occasion during the nine-month period. Based on the evidence presented, we find the trial court's unfitness finding is not against the manifest weight of the evidence.

¶ 48                                    III. CONCLUSION

¶ 49 We affirm the trial court's judgment.

¶ 50 Affirmed.