**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 200299-U

Order filed December 7, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* A.H., L.L.F.-W., and H.F., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-20-0299, 3-20-0300, |
| Petitioner-Appellee, | ) | and 3-20-0301 (Consolidated) |
| | ) | Circuit Nos. 15-JA-6, 15-JA-181, and |
| v. | ) | 15-JA-7 (Consolidated) |
| | ) | |
| Shaquanna J.F., | ) | Honorable |
| | ) | Frank W. Ierulli, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*:   The trial court's finding of parental unfitness was not against the manifest weight of the evidence. The trial court's finding that it was in the best interest of H.F. and L.L.F.-W. to terminate respondent's parental rights was not against the manifest weight of the evidence. However, the trial court's finding that it was in the best interest of A.H. to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 2    Respondent appeals from orders of the trial court terminating respondent's parental rights as to A.H., L.L.F.-W., and H.F., the minors. On appeal, respondent challenges both the trial court's finding that respondent was an unfit parent and the finding that it was in the minors' best interest to terminate respondent's parental rights.

¶ 3                                      I. BACKGROUND

¶ 4    On January 8, 2015, the State filed two separate petitions alleging that A.H. (D.O.B. 10/29/2010) and H.F. (D.O.B. 6/11/2014) were neglected minors due to an environment injurious to their welfare. 705 ILCS 405/2-3 (West 2014). The first set of neglect petitions alleged that on December 25, 2014, respondent was found unconscious from a possible overdose, and A.H. and H.F. were found lying on top of respondent. At the time, respondent admitted to drinking alcohol, knowing she was pregnant with L.L.F.-W. The neglect petitions further alleged respondent was the victim of several acts of domestic violence by the minors' putative fathers, Larry W. and Freddie B., including: a September 26, 2014, incident with Larry W. and an August 27, 2013, incident with Freddie B.[1] The petitions included the following allegations: that respondent initiated an order of protection proceeding against Larry W., which was later dismissed for lack of prosecution, that A.H. stated that her daddy always chokes and beats up respondent in front of A.H., and that in spite of this prior history, respondent married Larry W. in November 2014, among other things.

¶ 5    On April 22, 2015, the trial court adjudicated A.H. and H.F. neglected. On July 1, 2015, the trial court found respondent dispositionally unfit based on the December 25, 2014, incident, where respondent was discovered to be incoherent "due to [a] combination of medications and alcohol in the presence of the minors [and] while pregnant." The trial court further found that

---

[1]On April 6, 2015, Freddie B. was excluded as father of either minor and was excused from the case.

domestic violence was present in respondent's personal relationships. The trial court ordered respondent to complete tasks and/or services, including: cooperating fully with the Department of Children and Family Services (DCFS) or designees, providing the agency with information about any person with whom respondent forms a relationship that affects the minors, performing random drug drops three times per month, obtaining stable housing, providing caseworkers with any changes of address and/or phone number, and attending supervised visits. The trial court also ordered respondent to participate in and successfully complete counseling, a parenting course, and a domestic violence course.

¶ 6         On July 7, 2015, the State filed an additional neglect petition alleging a third child of the respondent, L.L.F.-W. (D.O.B. 6/16/15), was neglected due an environment injurious to his welfare based on the trial court's previous finding of respondent's parental unfitness with regard to L.L.F.-W.'s older siblings. *Id*. The trial court adjudicated L.L.F.-W. neglected on September 23, 2015, and found respondent dispositionally unfit with regard to L.L.F.-W. on December 16, 2015, due to "prior bases - not fully rectified." The trial court ordered respondent to complete the same set of tasks and/or services ordered following the finding of dispositional unfitness in A.H. and H.F.'s cases.

¶ 7         On July 11, 2019, the State filed petitions for the termination of respondent's parental rights (termination petitions) for all three minors. The termination petitions alleged respondent was an unfit person as defined in section 50/1(D)(m)(ii) of the Adoption Act in that responded failed to make reasonable progress toward the return of the minors, following the adjudication of neglect, during the nine-month period from September 20, 2018, to June 20, 2019. 750 ILCS 50/1(D)(m)(ii) (West 2018).

3

¶ 8                                    A. Fitness Hearing

¶ 9          On November 20, 2019, the trial court conducted a hearing on the fitness portion of the termination proceedings.[2] City of Peoria police officer Megan Rosenak testified that on the evening of June 19, 2019, respondent flagged Rosenak down. Respondent told Rosenak that her ex-boyfriend, Jordan Harris-Wade, had reached into respondent's vehicle, wrestled away her keys, and ran when he saw Rosenak drive past. Respondent indicated to Rosenak that she and Harris-Wade had been broken up for about two months and that the couple resided together until the breakup.

¶ 10         City of Peoria police officer Cole Klein testified that he was dispatched to a single-family residence at 609 East Illinois Avenue in Peoria, Illinois, on September 22, 2018, at 12:45 a.m. At this time, Klein spoke with "Joseph" Harris-Wade and "Jordan Wade-Miller" or "Megan-Miller."

¶ 11         Center for Youth and Family Solutions caseworker, Shannon Doubet, testified that she had been assigned to respondent's case for the last two-and-a-half years. Doubet testified that prior to the nine-month period at issue, respondent completed a domestic violence program in September 2015, a parenting class in December 2016, a psychological evaluation in May 2017, and a drug/alcohol assessment in July 2017. During the relevant time period, from September 20, 2018, through June 20, 2019, respondent's goal for the minors was "24," meaning that the goal was *not* a return home goal and that respondent was required to participate in services that she paid for herself.

_____

[2]The trial court admitted People's exhibit No. 1, respondent's psychological evaluation and People's exhibit No. 2, records concerning drug treatment and counseling. Counsel for respondent objected to the consideration of portions of the record outside of the relevant time period. The trial court took note of the objection and stated that it would only consider records within the relevant time period. The trial court also took judicial notice of various entries in the court file, including: the arraignment orders, adjudication orders, dispositional orders, and permanency hearing orders.

¶ 12        Doubet testified that she had no contact with respondent between September 20, 2018, and November 27, 2018. Doubet did not have respondent's current telephone number and was unsure where respondent was living. During this time period, respondent was visiting the minors once per month for one hour but was not participating in any other services. As of Doubet's recording of her April 7, 2019, report, respondent's contact with Doubet had improved. For instance, on January 9, 2019, respondent came to Doubet's office, reported that she still lived at the address on East Illinois Avenue, and presented Doubet with a pay stub from a nursing home facility. Doubet also received calls from respondent in late February 2019. Doubet testified that respondent began attending counseling in January 2019 and began to participate in drug and alcohol screens. In March 2019, respondent completed substance abuse treatment. Doubet described respondent's participation in monthly visitations with the minors from November 2018 through April 2019 as acceptable.

¶ 13        On May 20, 2019, Doubet held a meeting with respondent, respondent's counselor, and Doubet's supervisor. According to Doubet, respondent's counselor complained that she only recently received respondent's psychological evaluation. However, Doubet testified that she provided the counselor with respondent's evaluation in May 2018.

¶ 14        Doubet also testified that during the relevant time period, September 20, 2018, through June 20, 2019, respondent did not disclose an ongoing relationship with Jordan Harris-Wade or any other individual and did not disclose to Doubet that respondent was sharing a residence with Jordan Harris-Wade. When asked whether respondent had lost her driving privileges at some point after September 20, 2018, but before June 20, 2019, Doubet stated that while she was unaware if respondent lost her driving privileges, she knew respondent was charged with driving under the influence (DUI).

¶ 15 On cross-examination, Doubet testified that due to respondent's goal of "24," Doubet did not inspect respondent's home during the relevant time period, from September 20, 2018, through June 20, 2019. Doubet testified that she did not attempt to contact respondent during the time frame when she lost contact with respondent for two months, from September 20, 2018, until November 27, 2018. After receiving phone calls from respondent in February 2019, Doubet made unsuccessful attempts to reach respondent by telephone. On some occasions, Doubet was able to leave a voicemail, and on other occasions, respondent's telephone number was out of service.

¶ 16 Melissa Dessert testified on behalf of respondent. Dessert is a licensed clinical professional counselor and a drug and alcohol counselor. Dessert provided services as respondent's mental health therapist and/or counselor during the relevant time period, September 20, 2018, through June 20, 2019.[3] Respondent began counseling starting in May 2018. At that time, respondent presented with "anxiety, and loss, and grief, so she was diagnosed with generalized anxiety and bereavement." Dessert testified that she received respondent's psychological evaluation in May 2018. Dessert stated that respondent was motivated, was responsive to counseling, and was making progress, including in the area of healthy versus unhealthy relationships. Dessert believed respondent possessed the cognitive ability to parent. Ultimately, Dessert believed respondent made progress with the issues and concerns raised in the psychological evaluation. During counseling sessions, respondent requested drug screening, the results of which were negative.

¶ 17 On cross-examination by the guardian *ad litem*, Dessert testified that respondent's counseling sessions were typically conducted once every other week. Dessert did not see

---

[3]The trial court admitted respondent's exhibit No. 1, consisting of visitation records, without objection.

respondent consistently between September 20, 2018, and December 2018, however, Dessert testified that she was able to meet with respondent over the course of several consecutive months from January 2019 to June 2019.

¶ 18　　　　During this time period in 2019, respondent's progress included: good attendance, participation, receptiveness to feedback, and openness about respondent's evolving current circumstances. Dessert believed respondent was working though the loss of family members and thereby reducing her anxiety. Dessert confirmed that respondent submitted to drug and alcohol tests upon request and was addressing other issues such as manipulation, assuming responsibility, and healthy relationships. Dessert testified that respondent did not report any new relationships during the relevant time frame from September 20, 2018, through June 20, 2019.

¶ 19　　　　On cross-examination by the State, Dessert admitted that she had not seen respondent at all from September 20, 2018, through January 9, 2019. Dessert stated that she believed respondent lived alone in her own home during the relevant nine-month time period. Dessert believed the minors were initially taken into care after first responders found respondent unresponsive in response to respondent's own 911 call for help. Respondent reported to Dessert that her physical state was a result of drinking at a Christmas party. Dessert admitted that she had not reviewed the contents of the neglect petitions while supervising respondent's progress during the relevant nine-month time period from September 20, 2018, through June 20, 2019. Further, respondent did not alert Dessert to domestic violence in her relationships when Dessert made her initial counseling assessment. Thus, Dessert testified that respondent's counseling goals were initially developed to assist respondent's ability to cope with anxiety and loss rather than the issues that resulted in the removal of her children and the juvenile proceedings. Dessert dealt

predominantly with these personal goals until May 2019 when Dessert added "legal" to respondent's case.

¶ 20   On redirect examination, Dessert testified that she did not receive information from the agencies raising concerns of domestic violence in respondent's relationships or inappropriate relationships. Lastly, Dessert testified that a number, if not all, of the issues raised in the psychological report were discussed during counseling sessions.

¶ 21   The hearing on the termination petitions resumed on December 19, 2019.[4] Respondent testified that she successfully completed a parenting class, received a caregiver certificate, and was employed by Lutheran Hillside Village, Morton Terrace, and 4M Solutions at varying times during the relevant time period. Respondent testified that she was on probation for a DUI during the relevant time period, September 20, 2018, through June 20, 2019, and complied with the terms of that probation.

¶ 22   On cross-examination, respondent explained that she held the jobs successively, not simultaneously, and that she remained employed at Lutheran Hillside Village. According to respondent, she reported her employment status to Doubet.

¶ 23   At the conclusion of the testimony, the State, joined by the guardian *ad litem*, asked the court to find the termination petitions proven with counsel for respondent in opposition. The trial court held that while respondent made efforts during the relevant time period, respondent's efforts did not amount to reasonable progress toward the return of the minors. The trial court specifically pointed out that the relevant nine-month time period from September 20, 2018, through June 20, 2019, began approximately two-and-a-half years after the minors were taken

---

[4]The trial court admitted respondent's exhibit No. 2, consisting of "Countermeasures' records," respondent's exhibit No. 3., consisting of a caregiver certificate, and respondent's exhibit No. 4, consisting of respondent's earning statement from 4M Solutions.

into care. The trial court held that even though some progress had been made during the relevant time period from September 20, 2018, through June 20, 2019, respondent had not progressed enough to be any closer to the return of the minors. Therefore, the trial court entered an order finding the State's termination petitions were supported by clear and convincing evidence.

¶ 24                              B. Best Interest Reports

¶ 25        On May 12, 2020, the Center for Youth and Family Solutions filed a best interest report regarding A.H. The report indicated that nine-year-old A.H. had been in foster care since 2015 and was recently placed with new foster parents in December 2019. The report noted that A.H.'s basic needs for food, shelter, health, and clothing are being met through her current foster home and that the home passed DCFS inspection. A.H. shares a bedroom with one other child. A.H. currently attends Glen Oak Elementary School and does well academically. However, A.H. has struggled with certain behaviors including defiance, yelling out, running around the classroom, and being disrespectful. A.H. refers to her current foster parents as mom and dad and has asked her caseworker if she can stay in the home forever. However, A.H.'s foster parents are not willing to commit to providing permanency to A.H. A.H. continues to be defiant and argumentative, behaviors which are largely attributable to mixed messages from respondent regarding permanency goals/adoption. Consequently, A.H. exhibits negative behaviors, which sabotage her foster placements. The record indicates that A.H. has been diagnosed with Reactive Attachment Disorder. The caseworker opined in the report that once contact with respondent ceases, A.H. will be successful at decreasing her negative behaviors and settling into her forever home. A.H. enjoys seeing respondent during visitation and tells respondent she loves and misses her. The report concluded that because respondent has not made the lifestyle changes necessary to meet A.H.'s needs, it was in the best interest of A.H. to terminate respondent's parental rights.

¶ 26        The best interest report regarding five-year-old H.F. provided that H.F. had been in her current foster placement since July 2015, when H.F. was just over a year old. H.F. refers to her foster parents as mom and dad and the other children in the home as brother and sisters. H.F.'s foster family has provided stability and consistency for H.F. for many years and have expressed willingness to adopt H.F. H.F.'s basic needs of food, shelter, health, and clothing are met, and the foster home has passed DCFS inspection. H.F. has her own bedroom. H.F. currently attends kindergarten at Neil Armstrong Elementary School where she has a lot of friends. H.F. received speech and developmental therapy until she was four years old and is now academically on target. H.F. has a limited understanding of her relationship with respondent. H.F. will sometimes ask to visit her siblings and the family advocate but does not ask to visit respondent, though H.F. reports her visits with respondent as positive experiences. H.F. hugs respondent at the beginning and end of visits. The report indicated that H.F. had a stronger attachment to her current caregivers. H.F. has a positive relationship with a large extended family in the community. However, her foster family plans to move to South Carolina in the summer of 2020 and hopes H.F. will be permitted to move with the family. The report concluded that respondent had not made the lifestyle changes necessary to meet H.F.'s needs and that it was in the best interest of H.F. to terminate respondent's parental rights.

¶ 27        The best interest report regarding four-year-old L.L.F.-W. provided that L.L.F.-W. had been in his current foster home since March 2017. L.L.F.-W. refers to his foster parents as mom and dad and his foster mother's biological daughter as his sister. L.L.F.-W. has been with the family since he was a year-and-a-half old. L.L.F.-W.'s parents have expressed a willingness to provide permanency for L.L.F.-W. through adoption. L.L.F.-W.'s basic needs of food, shelter, health, and clothing are met through his current caregivers and the home has passed DCFS

10

inspection. L.L.F.-W. has his own bedroom. L.L.F.-W. attends preschool classes at Pekin Preschool Family Education Center and daycare at King's Kids. L.L.F.-W. remains in a special education classroom due to concerns with his speech and cognitive abilities. However, his teacher expressed that L.L.F.-W. made so much progress that he may no longer qualify for such services. L.L.F.-W. has behavior struggles at daycare where he exhibits aggressive behaviors and fails to comply with adult requests. L.L.F.-W. exhibits a limited understanding of his relationship with respondent, does not remember a time when he did not live with his current caregivers, and has never resided with respondent. L.L.F.-W. has a stronger attachment with his current caregivers than with respondent. L.L.F.-W. will sometimes ask to visit his siblings and the family advocate but does not ask to visit respondent, though L.L.F.-W. reports his visits with respondent as positive experiences. L.L.F.-W. hugs respondent at the beginning and end of visits. L.L.F.-W. has a positive relationship with the community and participates in tumbling and dance classes. The report concluded that respondent has not made the lifestyle changes necessary to meet L.L.F.-W.'s needs, thus, it was in the best interest of L.L.F.-W. to terminate respondent's parental rights.

¶ 28                               C. Best Interest Hearing

¶ 29            The trial court conducted a best interest hearing on July 1, 2020. At the outset, the court acknowledged receiving and reviewing the three best interest reports prepared by the Center for Youth and Family Solutions. On direct examination by counsel for respondent, Doubet testified that A.H. was not in an adoptive home at present, though A.H.'s behavior in the home had improved. A.H.'s current foster family planned to move out of state and did not want to separate A.H. from her siblings. Doubet indicated that A.H. would be referred to a placement program for foster parents that were willing to take children with an adoption goal. With respect to

11

respondent's visits, Doubet testified that respondent had had one virtual visit with H.F. and L.L.F.-W. in the preceding four months, but A.H.'s caregivers did not answer the call.

¶ 30    Respondent testified that she left Doubet several messages seeking to schedule more visits but had yet to receive a return call. Prior to the pandemic, respondent had in-person visits with the minors once per month for two hours. The minors recognized that they were siblings and played together during visits. The minors knew and loved respondent. They ran and jumped into her arms and referred to her as mom. Respondent interacted with the minors and brought them gifts, toys, and food during visits, including cake on the minors' birthdays. Respondent also helped A.H. with her homework and talked with the minors about following directions at school. Respondent testified that A.H. wanted to live with respondent.

¶ 31    Respondent testified that all the services assigned to her, including counseling, had been completed. Respondent felt that she had dealt with her relationships in counseling and was able to make good decisions about her relationships going forward. Respondent had not been involved in any domestic violence incidents and had not used illegal substances since her last court date. Respondent reported that she started her own culinary business and completed probation. Respondent was now living at a new address which she described as a four-bedroom home, furnished sufficiently for children. Respondent believed she was prepared for the minors to live with her within the next six months or less.[5]

¶ 32    The trial court, noting the statutory factors enumerated in section 1-3(4.05) of the Juvenile Court Act of 1987, found that it was in the best interest of H.F. and L.L.F.-W to terminate respondent's parental rights. 705 ILCS 405/1-3(4.05) *et seq*. (West 2018). The trial court acknowledged that A.H.'s case was less clear due to the current lack of a permanent

[5]To conclude the evidence portion of the hearing, the trial court admitted respondent's exhibit No. 1, consisting of a June 29, 2020, letter from Dessert.

12

placement for A.H. Nonetheless, the trial court found it was in A.H.'s best interest to terminate respondent's parental rights where A.H. needed the type of permanency which respondent was unable to provide. On July 9, 2020, the trial court entered written dispositional orders terminating respondent's parental rights to the minors. Respondent appeals.

¶ 33                                    II. ANALYSIS

¶ 34        On appeal, respondent challenges the trial court's findings that respondent was an unfit parent and that it was in the minors' best interest to terminate respondent's parental rights. Respondent argues the trial court's findings were against the manifest weight of the evidence where respondent made reasonable progress toward the return of the minors during the applicable nine-month period and where the termination of respondent's parental rights did not serve the minors' best interests. The State argues the trial court's findings should be affirmed where the record clearly documents respondent's lack of progress toward the return of the minors and where it was in the minors' best interest to terminate respondent's parental rights.

¶ 35                                A. Unfitness Finding

¶ 36        Parental termination proceedings are initiated pursuant to the filing of a termination petition pursuant to the provisions of the Juvenile Court Act of 1987. 705 ILCS 405/2-13(4) (West 2018); 705 ILCS 405/2-29(2) (West 2018). Thereupon, a parent's rights may be terminated upon clear and convincing evidence that the parent is unfit under any of the grounds enumerated in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d 405, 417 (2001); 750 ILCS 50/1(D) (West 2018). Section 50/1(D)(m)(ii) of the Adoption Act provides that a parent is unfit where the parent fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m)(ii) (West 2018). The

Adoption Act does not define progress. *In re C.N.*, 196 Ill. 2d 181, 211 (2001). However, our supreme court has held that the benchmark for measuring a parent's progress toward the return of the child "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17.

¶ 37		The trial court's finding that clear and convincing evidence of a parent's unfitness has been shown will not be overturned unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d at 417. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 38		Before making the fitness findings on December 19, 2019, the trial judge observed that the court had been involved with this family for more than two years. We also note that the neglect petitions for minors were filed in 2015. These details support the view that the minors have been without permanency for a significant period of time.

¶ 39		The fitness hearing in this case began on November 20, 2019, and concluded on December 19, 2019. At that hearing, the State was required to show by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the minors during the nine-month period from September 20, 2018, to June 20, 2019. The record stemming from the fitness hearing reveals that respondent completed many services prior to the relevant nine-month period from September 20, 2018, to June 20, 2019, including: a domestic violence program, a parenting class, a psychological evaluation, and a drug/alcohol assessment. Additionally, respondent completed substance abuse treatment in March 2019. However, respondent's progress stalled.

¶ 40        According to Doubet, respondent failed to fully cooperate with the Center for Youth and Family Solutions. For example, Doubet reported that respondent had no contact with Doubet between September 20, 2018, and November 27, 2018, and Doubet was not provided with respondent's current telephone number or address during this time. It appears respondent was residing in the same household as Jordan Harris-Wade during the relevant time period but did not inform Doubet or her counselor about this relationship. Doubet testified that respondent had been charged with, or was on probation for, a recent DUI during the relevant time period.

¶ 41        Furthermore, respondent did not schedule appointments or meet with Dessert from September 20, 2018, through January 9, 2019. While by all accounts, some measurable progress occurred from January through June 2019, this progress did not develop until midway through the relevant nine-month period.

¶ 42        Based on the evidence of record, this court is unable to conclude the trial court's findings of unfitness were against the manifest weight of the evidence. While respondent's completion of many services is commendable, respondent's delayed participation in services during the first half of the relevant time period, coupled with new legal troubles arising out of a DUI charge and/or conviction, support the trial court's conclusion that respondent did not make reasonable progress toward the return of the minors over the course of the entire nine-month time frame, beginning on September 20, 2018, and ending on June 20, 2019. We affirm the trial court's finding of unfitness.

¶ 43                         B. Best Interest Finding

¶ 44        Following a finding of parental unfitness, the court's focus must shift to the child's interest in "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At this stage, the burden of proof lessens to a preponderance of the evidence. *Id*. at 366. When considering

whether the termination of parental rights serves the child's best interest, court's consider: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) *et seq*. (West 2018). A trial court's determination as to the best interests of a child will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

¶ 45        The May 12, 2020, best interest reports documented that the three minors, who were nine, five, and four-years-old, respectively, all lived with foster parents who provided for the minors' basic needs for food, shelter, health, and clothing. Similarly, all three minors refer to their foster parents as mom and dad. H.F. and L.L.F.-W. had been with their foster families for as long as H.F. and L.L.F-W. could remember. All three minors have bonds with their current foster families. The reports indicated that the minors attend school and are on track educationally. However, A.H. exhibits some negative behaviors in the classroom, and L.L.F.-W. requires additional speech and developmental education. The minors exhibit healthy connections to their communities.

¶ 46        The reports further indicated that the younger siblings, H.F. and L.L.F.-W., have limited ties to respondent and do not ask to visit respondent. Both H.F. and L.L.F.-W. have strong attachments with their foster families. These families have expressed a willingness to provide permanency for H.F. and L.L.F.-W. through adoption. The reports documented that H.F. and

16

L.L.F.-W. received stability and consistency in their current placements. Importantly, the termination of respondent's parental rights sets H.F. and L.L.F.-W. on the clearest and swiftest path toward the attainment of permanency. For these reasons, we conclude the trial court's best interest findings regarding H.F. and L.L.F.-W. were not against the manifest weight of the evidence. We affirm the trial court's termination of respondent's parental rights as it relates to H.F. and L.L.F.-W.

¶ 47       However, as the trial court noted, nine-year-old A.H.'s best interests were somewhat complicated and differed from the best interests of the other younger siblings. For example, unlike her younger siblings who have been in long-term placements with their current foster parents, A.H. had been in multiple foster homes, in part, because of behavioral issues. In addition, unlike her younger siblings that lack strong ties to respondent, A.H. looks forward to her visits with respondent. It is undisputed that A.H. has a stronger bond to respondent and was able to recall a time when A.H. and respondent resided in the same household. Importantly, A.H.'s current caregivers plan to leave the state and were unwilling to provide permanency for A.H. In contrast, the younger siblings' foster parents were considering adoption. We are cognizant of the caseworker's opinion that respondent's continued presence in A.H.'s life served to exacerbate A.H.'s behavioral disorder issues, creating problems with her foster placements. However, we are unable to conclude that termination of respondent's parental rights, based on this unique record, would be beneficial to A.H. or would increase A.H.'s chances at attaining permanency.

¶ 48       The record indicates that A.H. would soon be referred to a placement program for foster parents that were willing to take children with an adoption goal. To this court's knowledge, A.H. has not yet been introduced to or been successfully assimilated into a foster family with an

adoption goal. Termination of respondent's parental rights may be difficult for A.H. to accept without any prospects of finding a suitable adoptive family. Moreover, adoption may be more difficult due to A.H.'s behavioral issues, which could increase upon permanent termination of mother's parental rights at this time. Until A.H. bonds to a family with adoption as a goal, the relationship with her mother may be the closest personal relationship in A.H.'s life. For this reason, we conclude that it is not in A.H.'s best interests to terminate respondent's parental rights and find the trial court's finding was against the manifest weight of the evidence. Perhaps respondent's progress will accelerate with the knowledge that this may be her last opportunity to maintain her parental status with respect to A.H.

¶ 49                                   III. CONCLUSION

¶ 50         The judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

¶ 51         Affirmed in part and reversed in part. Cause remanded.