**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210067-U

Order filed June 28, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* S.A.M., | ) | Appeal from the Circuit Court |
| | ) | of the 9th Judicial Circuit, |
| a Minor | ) | Knox County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0067 |
| | ) | Circuit No. 18-JA-29 |
| v. | ) | |
| | ) | |
| D.M., | ) | |
| | ) | Honorable Curtis S. Lane, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Holdridge and Lytton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not err in finding the father of the minor unfit and terminating his parental rights.

¶ 2    Respondent, D.M., is the father of the minor child S.A.M. (S.M.). Respondent appeals from the trial court's orders finding him unfit and terminating his parental rights. He argues that the court erred in finding that he did not make reasonable progress toward the return of the minor nor

reasonable efforts to correct the conditions resulting in the removal of the minor. He also argues that the lower court erred in its best interest finding. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On May 22, 2018, the Illinois Department of Children and Family Services (DCFS) removed S.M. from the care of her mother and respondent. S.M. was nine months old. The following day, the State filed a petition for adjudication of wardship alleging: (1) the mother had two children previously removed from her care by DCFS in 2015; (2) the mother was deemed unfit with respect to two of her other children; (3) in those cases, the mother's parental rights were terminated in January 2018; (4) on or about May 16, 2018, law enforcement served a search warrant at a residence, thereafter locating documents indicating both the mother and respondent lived there with S.M.; (5) inside the residence, police located more than 15 grams of a substance that field-tested positive for cocaine, some of which was packaged for sale; respondent admitted to police he was a "small time" drug dealer, and police located 40 hydrocodone pills for which no one in the residence had a valid prescription; (6) some of the cocaine was located on the floor of the bedroom in a pocket of a pair of sweat pants, and the mother, respondent, and S.M. were all located in the room; and (7) respondent tested positive for cocaine on January 5, 2018, April 19, 2018, and May 9, 2018.

¶ 5        The court appointed a guardian *ad litem* (GAL) for S.M. and entered a temporary custody order placing S.M. with DCFS. An adjudicatory order was entered in July 2018, finding S.M. neglected due to an injurious environment, *i.e.*, drugs in the home, unfitness of the mother, and stipulation of the parties to the allegations in the petition. The court entered a dispositional order in August 2018 making S.M. a ward of the court. The court also found the mother and respondent unfit due to substance abuse issues. Respondent was ordered to maintain housing that met minimal

requirements; obtain and maintain a legal and verifiable source of income; follow up on all recommendations of the identified service provider regarding substance abuse treatment; cooperate with any requested drug screens; and cooperate with all tasks designated in the client service plan. The service plan was filed and essentially mirrored the dispositional order. The service plan noted that S.M. had been placed with two of her maternal siblings in foster care.

¶ 6 The court conducted three permanency review hearings of note with the first taking place in February 2019 and the last taking place in January 2020. The gist of all the hearings was that respondent had consistent, appropriate housing and had been visiting S.M. on an inconsistent, sometimes unsanctioned basis, where it was reported that he did well performing parenting tasks and interacting with the minor. While he was attending counseling and completed a substance abuse assessment, he was not complying with his substance abuse counseling, nor regularly attending drug screens. When respondent did attend drug screens, there was more than one occasion where he would test positive for illicit substances.

¶ 7 At the permanency hearing in January 2020, the court stated, "we're going on two years that the child will be in placement. The parents have had a sufficient amount of time and the statutory amount of time to try to correct the conditions, and apparently that—that's not occurred." The court admonished the parents stating, "[y]ou need to correct the conditions that led to the placement of the child in DCFS's care, and you need to make sure you complete the service plan or risk termination of your parental rights." Respondent was further admonished that if his medical conditions were prohibiting him from completing services, he needed to supply evidence to the court that demonstrated that fact. The court found the parents had failed to make reasonable progress and changed the goal to substitute care pending termination of their parental rights.

¶ 8    The State filed a petition to terminate parental rights in July 2020, alleging that respondent was unfit in that he: (1) failed to make reasonable efforts to correct the conditions that were the basis for the removal of S.M. during the nine-month period of August 2019 to May 2020 pursuant to section 1(D)(m)(i) of the Adoption Act (Act) (750 ILCS 50/1(D)(m)(i) (West 2018)); and (2) failed to make reasonable progress toward the return of S.M. during the nine-month period of August 2019 to May 2020, pursuant to section 1(D)(m)(ii) of the Act (*id.* § 1(D)(m)(ii)).[1]

¶ 9    A fitness hearing commenced on December 29, 2020. The State presented testimony from Randall Aldridge, the Center for Youth and Family Solutions (CYFS) caseworker assigned to the matter. Aldridge testified that respondent's services included engaging substance abuse treatment, maintaining adequate housing, obtaining legal and verifiable income, and participating in drug screens. Respondent's substance abuse treatment was completed at "maximum benefit." The "max benefit" designation did not mean that respondent had successfully or unsuccessfully completed the counseling, just that he had completed the counseling and needed to apply the lessons learned in counseling and maintain sobriety. Aldridge stated that consuming alcohol was not considered part of maintaining sobriety.

¶ 10    Respondent failed to appear for 36 drug screens since August 2019. Aldridge did not recommend respondent for any additional substance abuse treatment. Aldridge went on to state that respondent maintained housing that met minimal parenting standards and reported having employment. While respondent reported being employed, Aldridge was unable to verify that employment, and respondent failed to produce any documentation of employment even when requested. Respondent reported receiving money monthly from an inheritance. However, Aldridge

---

[1] This petition originally stated that the relevant time period was August 2019 through July 2020. The State subsequently amended the petition to reflect that the relevant nine-month period was August of 2019 through May 2020, not July 2020. Respondent raises no arguments regarding this issue.

did not receive documentation verifying the inheritance even after requesting it. Respondent attended 50 to 60% of visits with S.M., but he also occasionally visited S.M. outside of scheduled visits at various times throughout the case. Respondent's health issues resulted in hospitalizations causing him to cancel visits. Aldridge received no documentation verifying these alleged hospitalizations.

¶ 11　　　　The State entered the certified and delegated records of respondent's drug screens from October 2019 through November 2020. In October 2019, respondent tested positive for alcohol on one occasion and alcohol and cocaine on another. In December 2019, he tested positive for alcohol and tetrahydrocannabinol (THC). In February 2020, he tested positive for amphetamines, alcohol, and THC on one occasion and positive for only THC on another. In March 2020, he tested positive for amphetamines, methamphetamine, and alcohol.

¶ 12　　　　Respondent testified as follows. He had been employed at a bar and grill for just over a month and received a monthly inheritance from his grandfather's trust. He suffered from diabetes, stage 2 kidney disease, congestive heart failure, and hypertension, requiring hospitalization four separate times over the previous 18 months. He did not provide documentation to Aldridge verifying the hospital stays. He also did not provide proof of employment, nor proof of distributions from the trust. Respondent claimed to have been drug-free for a few months and blamed Aldridge for cancelling drug drops due to his hospitalizations and then failing to note the reason for the cancelled drops in reports. He and the mother of S.M. still lived together. He could not remember if the mother was present during the pendency of the case when he was using illicit substances.

¶ 13　　　　The court found respondent unfit on the grounds advanced by the State, specifically for inconsistent attendance at drug drops, positive drug drops, and a failure to refrain from the use of

illegal substances and alcohol. The trial court opined that respondent's alleged hospitalizations did not explain all of the missed drug drops. The trial court noted a lack of either proof of employment or hospitalization evidencing the missed drug drops were excused. There was also no proof of income from the trust. After reviewing CYFS and DCFS policies, as well as its own policy, the court found respondent was not to ingest cannabis, alcohol, or any other illegal drugs unless prescribed by a physician. In sum, the court found "no evidence to suggest that these parents are sober or can consistently be sober to take care of a child. The overwhelming evidence here is the parents have continued to use over and over and over." The court found both parents unfit by clear and convincing evidence.

¶ 14  A best-interest hearing ensued on February 3, 2021. At the time of the hearing, S.M. was approximately 3½ years old. Aldridge testified that S.M. had been in her current foster home for over 2½ years. There had been no issues in her foster home. S.M. was bonded with her foster parents and foster siblings. Two of the foster children in the home were S.M.'s maternal siblings and had been adopted by the foster parents. The foster parents intended to adopt S.M. if that were to become an option and signed a permanency commitment to that effect. The foster parents also enrolled S.M. in a head start preschool. Overall, Aldridge believed S.M. was in a loving and nurturing environment that gave her a sense of security and continuity.

¶ 15  Aldridge also stated that respondent had completed two additional drug screens in December and January that were both negative. He continued to maintain appropriate housing and visit with S.M. Although respondent still claimed to be employed, Aldridge still had not received documentation verifying respondent's employment.

¶ 16  The foster mother testified as follows. S.M. calls her mom, and she and her husband have adopted two of S.M.'s siblings. In addition, she had just become the foster mother to S.M.'s seven-

week-old brother. S.M. is bonded to all of the members of the household. If S.M. were to scrape her knee, of all available parental figures, she would go to respondent. Within the foster home, S.M. turns to her and her husband for comfort and reassurance. Her home was the only placement that S.M. has had after being removed from respondent's care.

¶ 17 A best interest report prepared by Aldridge and another prepared by the GAL were entered into evidence. Both reports recommended the termination of respondent's parental rights and that the foster parents adopt S.M. In closing arguments, the State, GAL, and counsel for DCFS all agreed that based on the statutory factors, it was in S.M.'s best interest that the court terminate respondent's parental rights.

¶ 18 In ruling, the court noted that while there was a bond between respondent and S.M., the minor had spent most of her life in the foster home. The foster parents financially provided for the minor, nurtured her, and provided for any need that had arisen. The court then held it was in the best interest of S.M. to terminate both the mother's and respondent's parental rights.

¶ 19 Respondent appeals.

¶ 20         II. ANALYSIS

¶ 21 Respondent argues that the lower court erred in finding him unfit and terminating his parental rights. He also argues that he made reasonable progress and reasonable efforts. The State argues respondent failed to put forth either reasonable efforts or make reasonable progress toward the return of the minor and that the court's best interest findings were not against the manifest weight of the evidence.

¶ 22         A. Fitness

¶ 23 Section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 2018)) provides two grounds for finding a parent unfit: (1) failure to make reasonable progress toward the return of the child; and

(2) failure to make reasonable efforts to correct the conditions that were the basis for removal of the child. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). While the two grounds coexist within the same subparagraph of the Act, they are distinct, requiring individual analysis. *Id.* The State bears the burden of proving by clear and convincing evidence that the parent is unfit. *In re N.G.*, 2018 IL 121939, ¶ 28. Because each statutory ground of unfitness is independent, we may affirm if the evidence supports a finding of unfitness on any one of the alleged statutory grounds. *Id.* We focus on reasonable progress in this matter as it is dispositive to respondent's claim the court erred in finding him unfit.

¶ 24 Reasonable progress is an objective standard, focused upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. The benchmark for measuring reasonable progress under section 1(D)(m) of the Act encompasses the parent's compliance with the service plan and the court's directives, in light of the conditions giving rise to the removal of the minor, while also considering other conditions which later arise preventing the return of the child to the parent. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists when a court can conclude that progress by a parent complying with directives given for the return of the minor is sufficiently demonstrable and of such a quality that the minor will be able to be returned to parental custody in the near future. *D.T.*, 2017 IL App (3d) 170120, ¶ 17. A parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care flies in the face of reasonable progress toward the return of the minor. *Id.*

¶ 25 A finding of parental unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208. The trial court's decision is against the

manifest weight of the evidence only if it is clearly apparent from the record that the court should have reached the opposite conclusion. *Id.*

¶ 26 The lower court's fitness finding is supported by the manifest weight of the evidence. During the relevant nine-month period, respondent continually violated the court's directives and service plan. Although he completed substance abuse counseling at "max benefit," he then failed to apply the teachings learned in counseling. Respondent repeatedly consumed alcohol and illegal substances. As a result, he failed numerous drug screens.

¶ 27 Respondent attempts to place the blame for a number of missed drug screens on Aldridge for failing to note hospitalizations. Nonetheless, the court made clear during a permanency hearing that respondent needed to provide evidentiary support for the assertion that hospitalizations prohibited attendance at the mandated screens. This evidence was never provided. Similarly, during the years' long pendency of this case, including the relevant nine-month period, respondent failed to provide proof of a legal and verifiable source of income. Despite the request for documentation relating to employment and a distributional interest in a trust, respondent failed to produce any documentation.

¶ 28 Respondent was no closer to the return home of S.M. than he was at the beginning of this case. The only component of the service plan and court order that respondent did comply with was maintaining suitable housing. However, the housing situation presents its own issues, as respondent was still living with the unfit mother while both intermittently consumed illicit substances. The failure to comply with the service plan and court order flies in the face of reasonable progress. *D.T.*, 2017 IL App (3d) 170120, ¶ 17. Respondent failed to make reasonable progress toward the return of S.M.

¶ 29 B. Best Interest

¶ 30    Respondent next contends that the court erred in finding it would be in the best interest of S.M. to terminate his parental rights.

¶ 31    When considering whether the termination of parental rights serves the child's best interest, a court is tasked with weighing and balancing: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id.* We will not reverse a finding terminating parental rights unless it is against the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d 628, 633 (2006).

¶ 32    The circuit court did not err in terminating respondent's parental rights. The GAL filed a report recommending that the foster family adopt S.M. Aldridge recommended the court terminate respondent's parental rights based on the facts of the case and the above factors. Aldridge testified that he believed it was in S.M.'s best interest to remain in the foster home. Through testimony and written reports, the court was presented with evidence that the foster parents had provided S.M. with a stable, safe, loving, and nurturing home. S.M. was bonded with her foster parents, her maternal siblings, and the other foster children in the home. S.M. was happy in her foster home

and the foster parents ensured all of her needs were met. The foster parents were committed to adopting S.M. and giving her permanence.

¶ 33 Respondent states that he had a strong bond with S.M. and the conditions leading to her removal "for the most part" had been resolved. Respondent fails to analyze the statutory factors a court is mandated to consider when making a best interest finding. Instead, based on his bond with S.M., he contends the trial court erred. We disagree.

¶ 34 After reviewing the statutory factors, it becomes clear that the lower court did not err. The physical safety and welfare of S.M., including food, shelter, health, and clothing are met by the foster family. Evidence supports the assertion that S.M. is happy, content, and well-adjusted. S.M. was placed with two of her maternal siblings, which the foster family adopted as well as S.M.'s baby brother. S.M.'s bond and attachment with her foster parents and members of the foster household is evident. S.M. was nine months old when she was removed from respondent's care; she was over three years old at the time of the best interest hearing. At the time of this writing, she is nearly five years old. Given the age she was removed from respondent's care, the foster parents' home is the only home she has ever known. The foster parents wish to adopt S.M. and signed a commitment to do so. It is time to give S.M. permanence. See *In re J.L.*, 236 Ill. 2d 329, 344-45 (2010). While the foster mother testified to, and the lower court acknowledged the bond between S.M. and respondent, this alone is insufficient to reverse the lower court's decision as the other factors clearly weigh in favor of terminating respondent's parental rights.

¶ 35 Accordingly, the trial court's ruling regarding fitness and the best interest of the child are not against the manifest weight of the evidence.

¶ 36 III. CONCLUSION

¶ 37 For the foregoing reasons, we affirm the judgment of the circuit court of Knox County.

¶ 38         Affirmed.