NOTICE
Decision filed 01/09/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230625-U

NO. 5-23-0625

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* T.A., M.A., M.J., and K.A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 21-JA-19 |
| v. | ) | |
| | ) | |
| Pearl J., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Vaughan and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not err in finding respondent an unfit parent and terminating her parental rights in light of testimony that she was unable to control her children or provide a safe environment for them, viewed them primarily as a means of easing her anxiety, and evidence that all four children were doing well in their foster placements. As any argument to the contrary would lack merit, we grant defendant's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Pearl J., appeals the circuit court's orders finding her an unfit parent to her children, M.J., T.A., M.A., and K.A., and terminating her parental rights. Her appointed appellate counsel concludes that there is no reasonably meritorious argument that the court erred in doing so. Accordingly, he has filed a motion to withdraw as counsel together with a supporting memorandum. He has notified respondent of his motion, and this court has provided her ample

1

opportunity to respond, but she has not done so. Having reviewed the record on appeal and counsel's motion and memorandum, we agree that this case presents no reasonably meritorious issues. Thus, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4     On March 4, 2021, the State filed a petition for adjudication of wardship alleging that M.J. had been abused and all four minors were neglected. The court placed the children in the temporary custody of the Department of Children and Family Services (DCFS), which had taken protective custody of them.

¶ 5     Following adjudicatory hearings on May 21 and May 28, 2021, the court found that the State had proved the petition's allegations. In its adjudicatory orders entered on those dates the court noted that a doctor who examined M.J. found healed "loop marks" on his back and opined that they were the result of being hit with a cord or wire, and that a child-protection specialist who visited the family home found it to be "very messy and unsafe[,] including trash covering the floor and dog feces on the floor."

¶ 6     Following a July 2, 2021, dispositional hearing, the court found all four children neglected and M.J. abused and neglected. The court found Pearl and Trevon A., the putative father of three of the children, unfit and unable to care for them and placed them in DCFS custody. The court subsequently found Jason B., the putative father of M.J., in default and entered adjudicatory and dispositional orders finding him unfit and unable to care for M.J. and placing M.J. in DCFS custody.

¶ 7     On May 19, 2022, the State filed a motion to find the parents unfit and to terminate their parental rights. In its motion, the State alleged in count I that respondent was unfit because she was unable to discharge her parental responsibilities due to long-term mental impairment, mental

illness, or intellectual or developmental disability and in count III that she failed to make reasonable progress toward the children's return between August 18, 2021, and May 18, 2022.[1]

¶ 8 A termination hearing commenced on July 13, 2022. Respondent did not attend. Jessica Jones testified she had been respondent's caseworker since March 2021. During the relevant nine-month period, she had observed respondent's home to be persistently unclean, with trash on the floor, overflowing garbage bins, empty food containers in the restroom and bedroom, writing on the walls, and "unsafe" items on the floor. Jones had spoken with respondent the week before the hearing, which respondent said she planned to attend.

¶ 9 Jones testified that respondent completed an integrated assessment. As a result of this process, she was referred for parenting education, which she completed. Respondent also completed a mental health assessment, which did not recommend further treatment, a substance abuse assessment, which also did not recommend further treatment, and habilitation services. Later, she was also referred to Dr. Michelle Iyamah, for psychological and parenting capacity assessments.

¶ 10 In April 2022, Jones referred respondent to the Center for Youth and Family Services for counseling, because "she seemed to be having a hard time digesting the case as *** time went on." Respondent was receptive to the idea but was put on a waiting list.

¶ 11 As of August 2021, visitation was scheduled for two hours, twice weekly, in the parents' apartment, where it remained until early 2022, when it was returned to DCFS's office because of ongoing concerns about the unsafe environment. By May 2022, by which time the parents had separate homes, Jones became concerned that respondent could not safely parent all the children

---

[1]Count II was directed at Trevon A. and count IV was directed at Jason B. Neither are parties to this appeal.

at any given time. She observed two visits in September 2021 and April 2022. At the first, respondent interacted more with K.A., the youngest child, who "require[d] less running around." Jones never saw respondent provide for all the children of her own accord. She required constant coaching. For example, she had to be prompted to run after T.A. when he ran off and had to be prompted to take the children to the bathroom and to change their diapers. Respondent appeared to be bonded with K.A. but not the other children.

¶ 12    At the April 2022 visit, respondent struggled to control the children, who were running away from her, amid much chaos. Jones was concerned because K.A. was small, the other children had developmental delays, and it did not seem as though respondent knew how to care for them properly. The older children had ADHD, and T.A., M.J., and M.A. could be aggressive, placing K.A. in danger because respondent seemed unable to stop the aggression. Respondent would sometimes try to discipline the children by putting them in a corner, but they would not stay.

¶ 13    By May 2022, respondent's visits remained supervised. During her time on the case, Jones never considered allowing respondent to have unsupervised contact with the children, let alone placing them with her, because of ongoing concern about her ability to keep them all safe and to care for them at the same time by herself.

¶ 14    Respondent was cooperative with the psychological and parenting capacity assessments and, generally, cooperated with services throughout the relevant period. She remained in contact with DCFS and regularly attended visits. However, despite respondent's completion of services, Jones had seen no consistent improvement of respondent's parenting ability.

¶ 15    During the relevant period, respondent did not maintain consistent employment but held multiple jobs. She explained that her employers would not work around her visitation schedule. Consequently, she also had trouble maintaining a stable home. DCFS did not help her with rental

4

payments because, in late 2021, Jones completed a budgeting form with respondent, "and the home that she had was too high for her to afford, so she would have continued [to be unable] to pay her monthly bills." Respondent did not seem to understand that she needed to move to a home she could afford, and she has been unable to better budget her money to meet basic needs. The termination hearing was continued until September 22, 2022.

¶ 16 On September 22, 2022, Tawnya Fairchild, a visitation supervisor, confirmed that respondent's visits with the children were frequently chaotic, characterized by "a lot of yelling" by respondent at the children, and the children being unruly to the point that Fairchild had to intervene for their safety. The children were "runners," so it was a full-time job to keep them safe. Respondent was unable to secure all the children at any given time. In fact, there was never, in the history of the case, a visit when respondent did not require Fairchild's assistance handling the children. She also never took the initiative to transport the children to or from visitation. She was not prepared for visits, frequently lacking necessary items with which to care for the children, such as diapers or wipes, and was often late for visits because she had to buy snacks on the way. The hearing was continued until November 3, 2022.

¶ 17 On November 2, 2022, Iyamah testified that she conducted a psychological evaluation and parenting capacity assessment of respondent. Iyamah found respondent's intellectual level to be "in the average range," and her intellectual and academic functioning "adequate for parenting." However, Iyamah noted "a fair amount of anxiety." She could not provide a more specific diagnosis given that respondent claimed to have symptoms of anxiety but was not "real forthcoming" as far as its severity and inception. Respondent was "guarded and not *** wholly participatory in the assessment," and thus did not provide Iyamah enough information to assess her personality.

¶ 18    One statement by respondent that Iyamah recalled was that the children "were meant to protect her; they were her protectors, because she had fears and anxieties." Thus, there was "role reversal, that she was using her children *** as shields for her emotional deficits rather than being there for them[ ] and taking care of their needs." In observing the children with respondent, Iyamah found they did not listen to her, and the atmosphere was chaotic. They frequently asked for their father. Often, "there was open defiance." Respondent was unable to handle the children, yelling at and threatening them rather than showing positive parenting.

¶ 19    Iyamah's conclusion, regarding respondent's ability to safely parent her children, was that "she would struggle a lot, as she did in the brief observation I had with her. She wasn't able to take charge of the kids. She wasn't really affectionate, she wasn't appropriate. She wasn't able to really discuss their needs, and their developmental issues to any *** degree." Iyamah concluded that the children would not be safe in respondent's care.

¶ 20    Iyamah's psychological and parenting capacity assessment of respondent noted that respondent's impairments in social and emotional functioning significantly impacted her insight, judgment, and decision-making abilities. She "did not show significantly positive coping skills and *** sleeps when she is stressed." She required individual therapy to "address her unexamined/unresolved trauma history" and "requires continued parent coaching." Respondent did not show affection toward her children and did "not appear to be able to meet minimum parenting needs." Iyamah found it "very unlikely [she] will be capable of parenting her young children, especially given the need to care for a newborn, as well," and she did not "appear to have the capacity to care for the safety and security of her children."

¶ 21    After considering this evidence, the court found respondent unfit based on counts I and III of the petition.

¶ 22    At the subsequent best-interests hearing, the court considered several best-interests reports. A report filed by Camelot Care Centers and pertaining specifically to M.J. noted that he had since March 2022 been placed with his grandparents, who were "supportive and understanding of the issues [he] faces[ ] and have been diligent with tending to his needs." Respondent had not personally visited with M.J. since January 2022. However, she phoned monthly. She had recently revealed that she had been living in Michigan, where she recently gave birth to a daughter. The report quoted respondent as saying that she would be willing to give up her rights to her other children in the hopes of starting a new family in Michigan and concluded that it would be in M.J.'s best interest to be adopted by his grandmother and her husband.

¶ 23    A report filed by DCFS regarding M.A. and K.A. noted that respondent moved to Chicago in June 2022 but had never provided an address. Shortly thereafter, she "disengaged from this case and her residence was unknown." A diligent search found that respondent was living in Flint, Michigan, although DCFS remained unaware of her exact address. She was reportedly living with another man, with whom she had a child. DCFS recommended terminating respondent's parental rights.

¶ 24    A Champaign County Court Appointed Special Advocates (CASA) report similarly recommended terminating respondent's rights to all four children. Another report by One Hope United recommended terminating respondent's rights to T.A.

¶ 25    Respondent testified that she lived in Michigan, with her two-month-old daughter, K.S., and her daughter's father. For the past year, she had been a supervisor for a company called Northgate. She had had a stable, rented home for the past 10 months. Michigan Protective Services was aware of her involvement with DCFS but, following an investigation, allowed her to retain

7

custody of K.S. She believed she could still be "a positive presence in the lives of her children" in Illinois.

¶ 26 The court found it in the best interests of all four minors to terminate respondent's parental rights. Respondent timely appealed.

¶ 27 ANALYSIS

¶ 28 Respondent's appointed counsel first concludes that there is no reasonably meritorious argument that the circuit court erred in finding respondent an unfit parent. The Juvenile Court Act of 1987 delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(1) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P*., 215 Ill. 2d 340, 349 (2005). The State need prove only one ground of unfitness to find a parent unfit. *In re J.A*., 316 Ill. App. 3d 553, 564 (2000). A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21.

¶ 29 Here, the court found respondent unfit on two separate grounds: that she was unable to discharge her parental responsibilities due to a "mental impairment, mental illness or an intellectual disability" (750 ILCS 50/1(D)(p) (West 2022)) and that she failed to make reasonable progress toward the children's return within the relevant period (*id.* § 1(D)(m)(ii)). Taking the second ground first, the evidence overwhelmingly supported the court's finding that respondent failed to make reasonable progress within the relevant nine-month period.

¶ 30 "Reasonable progress relates to progress towards the broadly defined goal of the return of the child to the natural parent. [Citation.] The standard by which progress is to be measured is parental compliance with the court's directives, the DCFS service plan, or both." *J.A*., 316 Ill. App.

8

3d at 564. "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re M.C.*, 201 Ill. App. 3d 792, 798 (1990). Despite the importance of the service plan, a court, in measuring a parent's progress toward the return of the child, should not focus solely on the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d 181, 214 (2001). Instead, the central focus in evaluating a parent's progress toward the return of the child remains, at all times, on the fitness of the parent in relation to the child's needs. *Id.* at 216.

¶ 31    Here, despite evidence that respondent complied with basic service plan directives, such as obtaining evaluations and attending visitations, the evidence showed no substantial progress toward the goal of returning the children to her care. Visits continued to be chaotic, with respondent unable to control the children's often aggressive behavior and often forgetting to bring essential items. Jones testified about respondent's difficulties in maintaining a clean, stable home and stable employment. Both Jones and Iyamah were concerned that she would be unable to keep the children safe. Accordingly, we cannot say that the court's finding that respondent failed to make reasonable progress was against the manifest weight of the evidence.

¶ 32    The court also found that respondent was unable to discharge her parental responsibilities due to a mental impairment, mental illness, or an intellectual disability. As counsel notes, the evidence of this ground was somewhat closer. Iyamah found that respondent's intellectual capacity was in the normal range. She suffered from self-reported anxiety symptoms, but Iyamah was unable to make a more specific diagnosis given that respondent was less than forthcoming about the reasons for her anxiety or specific symptoms. Nevertheless, respondent seemed unable to form a bond with the children, except perhaps for the youngest, and believed that their purpose was to help her relieve her anxiety, rather than viewing herself as providing for their needs.

9

¶ 33  As counsel further notes, however, reversing the circuit court on this point would require us to reweigh the evidence, which we may not do. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Moreover, even if we did so to respondent's benefit, we still would not disturb the circuit court's finding. The State need prove only one ground of unfitness (*J.A.*, 316 Ill. App. 3d at 564) and the State clearly proved a lack of progress.

¶ 34  Counsel next concludes that there is no reasonably meritorious argument that the court's finding that terminating respondent's parental rights was in the children's best interests. Once the court determines that a parent is an unfit person, the court must decide whether it is in the best interests of the minor to terminate parental rights. 705 ILCS 405/2-29(2) (West 2022). At this stage, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove, by a preponderance of the evidence, that the minor's best interests justify termination of the parent's rights. *Id.* We will not reverse a finding that termination of parental rights is in the child's best interests unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1116 (2002).

¶ 35  Here, the evidence supported the court's finding that the children's best interests required terminating respondent's parental rights. Respondent's testimony at the hearing showed that she had made significant changes in her life, moving to Michigan, and starting a new family. She had maintained stable housing and employment. However, at this stage of the proceedings, the court was required to focus on the children's best interests rather than respondent's progress or lack thereof.

¶ 36  Evidence directly related to the children's bests interest uniformly favored termination of respondent's parental rights. Camelot's report concluded that M.J. was in a loving placement with

10

his grandparents, who were willing to adopt him. The report noted that respondent had only recently been located in Michigan and had played no role in M.J.'s life in recent months.

¶ 37    In its report on M.A. and K.A., DCFS noted that, "although [respondent] was engaged and showed effort initially, she left and went to Chicago *** leaving her children behind and starting over. *** [She] has failed to show consistency and progress in her parenting." Meanwhile, both children were flourishing in their foster placements. Champaign CASA similarly lauded the foster care of the children and noted respondent's detachment from them. Finally, One Hope United reported positively on T.A.'s placement and his future prospects with his foster family.

¶ 38                                                  CONCLUSION

¶ 39    As this appeal presents no issue of arguable merit, we grant counsel leave to withdraw and affirm the circuit court's judgment.


¶ 40    Motion granted; judgment affirmed.